TRIANGLE UNDERWRITERS, INC.,
Plaintiff-Appellant,

v.

HONEYWELL, INC. and Honeywell
Information Systems, Inc.,
Defendants-Appellees.

No. 622, Docket 78–7532.

United States Court of Appeals,
Second Circuit.

Argued April 25, 1979.

Decided July 17, 1979.

Jeffrey Zivyak, New York City (Berman & Zivyak, New York City, on brief), for plaintiff-appellant.

Thomas A. Shaw, Jr., New York City (Breed, Abbott & Morgan, Leonard A. Mentzer, Robert R. Elliott, III, New York City, on brief), for defendants-appellees.

Before FEINBERG, Circuit Judge, MANSFIELD, Circuit Judge, and HAIGHT, District Judge.*

HAIGHT, District Judge:

Plaintiff-appellant Triangle Underwriters, Inc. ("Triangle") commenced this action in the United States District Court for the Eastern District of New York against defendants-appellees Honeywell, Inc. ("Honeywell") and Honeywell Information Systems, Inc. ("H.I.S.") to recover damages for the alleged failure of performance of a computer system sold by appellees to Triangle. Jurisdiction in the district court was founded upon diversity of citizenship, 28 U.S.C. § 1332(a)(1), it being alleged that Triangle was a New York corporation, Honeywell a Minnesota corporation, and H.I.S. a Massachusetts corporation. Triangle's second amended complaint, which forms the subject matter of this appeal, charged in essence that the computer system installed by appellees failed entirely of performance, causing Triangle great damage and its ultimate commercial demise.

The complaint alleged causes of action sounding in fraud, breach of contract, and negligence. The district court (Eugene H. Nickerson, *Judge*) granted appellees' motion for summary judgment and dismissed the complaint in its entirety, on the basis that all claims asserted were time barred. 457 F.Supp. 765. This appeal followed. We reverse dismissal of one of the fraud counts, affirm dismissal of the other counts, and remand for further proceedings consistent with this opinion.

I.

In its second amended complaint, Triangle alleged that it was a general agent for many insurance companies, undertaking the placement of casualty insurance from brokers, and assuming responsibility to bind the carriers, bill the brokers, collect the premiums, remit the premiums to the carriers, keep records of payments, extensions, cancellations, credits, remit commissions to brokers, issue policies, and update all records.

Through the arteries of such an insurance organism flow quantities of paper. Triangle relied on computers to process this paper. As of January, 1970, Triangle had for some time been using an IBM 360–20 computer, coordinated with its own programs and manual card system. At that time, the complaint alleges, Honeywell solicited Triangle to replace the IBM equipment with the Honeywell H–110 computer system.

The H–110 system, as described by the district judge, is a package consisting of "hardware," or the core computer, printer, collator, and related equipment; and "software," the designation for programming created for use in connection with the hardware. Honeywell supplied both standard programming aids of general application to its computer, and "Custom Application Software" specifically designed for customer's individual needs.

Honeywell's blandishments bore fruit. On March 19, 1970, after a number of meet-

---

* Hon. Charles S. Haight, Jr., District Judge of the Southern District of New York, sitting by designation.

ings between Honeywell and Triangle representatives, Honeywell sent Triangle a proposal which, in Honeywell's view, "indicates immediate economic and operational benefits will be derived from the installation of a Honeywell 110 Computer System." The proposal contemplated the leasing by Triangle of Honeywell hardware. Honeywell employees were to install the system and train Triangle employees in its use, who would then take over complete operation. Triangle signed the hardware lease on April 3, 1970. Honeywell thereupon began preparation of the "Custom Application Software." In December, 1970, Honeywell advised Triangle that the system was fully operational.

At that point, Triangle elected to purchase rather than lease the hardware. On December 5, 1970, Triangle entered into a contract of sale with defendant-appellee H.I.S., a separately incorporated division of Honeywell. The system was installed in January, 1971, at which time Triangle discarded the IBM system.

The new Honeywell system was brought on line with high anticipation. Triangle's president Robert Weinstein, present at the first computer run, used a poignant analogy: "A new baby was being born, and I was very concerned with the success of that baby and how healthy it was going to be." But the "delivery" gave immediate cause for concern. The system first tried to print out invoices on a summary form. It was immediately apparent that all of the figures in the first batch were wrong. Weinstein testified: "There was literally a scream and I panicked." Honeywell personnel, murmuring reassurances, threw out the first run of invoices and produced a second. This second set was sent out to Triangle's broker-customers. It produced a wave of complaints about billing inaccuracies. These complaints continued every month,

"for the rest of the time we were in business." [1]

In addition to billings, the system was supposed to produce "runs" on other statistics. The entire system was not run in January of 1971. In addition to the run on billings, there was a monthly run on production from each individual producer; a run on dividends paid by insurance companies to insureds; a run on Triangle's cash receipts, on a daily, weekly and then monthly basis; a renewal record run on a monthly basis; and a cancellation record run. The last-named run was never performed. The cash receipts were run to some extent during the month of January. The renewal records were run in March, April or May. The monthly run by producers was first performed in April. The run on dividends was first attempted perhaps a year after installation. Errors appeared repeatedly in each of these computer runs. [2]

Subsequent to January, 1971, Honeywell personnel attempted without success to correct the deficiencies in the programs, modifying certain of them. Honeywell personnel worked on the system at the Triangle premises until some time in 1972, when they departed, never to return.

### II.

Triangle filed its initial complaint on August 14, 1975. The second amended complaint contains nine counts. Count I charges Honeywell with fraudulent inducement, in that it falsely represented to Triangle that the H–110 system would be a "turn-key" system, [3] superior to Triangle's present computer in many ways. Count II charges Honeywell with fraud in falsely representing to Triangle that it was ready to install a fully tested and operative system commencing in January, 1971. [4]

---

1. The quotations are taken from Weinstein's deposition, A. 483–491.

2. *Ibid* at A. 499–506.

3. "In industry parlance 'turn-key' is referred to as a System which is pre-prepared and can be virtually plugged right in and ready to function

immediately." Triangle's memorandum to district court, Transmittal Document # 40 on Record on Appeal.

4. Count IX also includes general allegations of fraud against both Honeywell and H.I.S. The fraud allegations are considered in greater detail under Point IV, *infra*.

Counts III, IV and V allege various contract claims against Honeywell: breach of an oral contract to provide an effective system (III); and breach of express (IV) and implied (V) warranties in the written contract.[5]

Counts VI–IX sound in negligence, asserting various theories against either or both appellees: failure to realize the system was inadequate (VI); negligence in preparation and design of the system (VII); failure to supervise and correct deficiencies in the system (VIII); and wrongful withdrawal of support personnel (IX). These last two counts Triangle characterizes as "computer malpractice."

The district court, applying statutes of limitation derived from New York law,[6] dismissed all counts as time barred.

### III.

We agree that the contract claims are barred by the applicable statute of limitations.

■ The district court properly held that the written contract of sale of December 5, 1970 falls within the Uniform Commercial Code ("U.C.C."), § 2–725(1) of which provides:

"An action for breach of any contract of sale must be commenced within four years after the cause of action has accrued."

§ 2–725(2) provides:

"A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of

the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered."

In the case at bar, the breach of the contract pleaded by Triangle accrued in January, 1971, over four years before suit was commenced in August, 1975. The contract causes of action are accordingly barred by § 2–725(1).

Triangle's second amended complaint alleged that Honeywell represented its system would be a "turn-key" system (Count I), able to "function immediately in place of [Triangle's] present system" (Count II). Count III alleges an oral contract to install a " 'turn-key' system that would be capable of operating within a relatively short period of time"; Counts IV and V allege breaches of express and implied warranties to furnish Triangle with a "totally integrated 'turn-key' system which would be fit for the purposes required by the plaintiff in its operations." The negligence counts (see, e. g., Count VII, ¶ 50) define Honeywell's negligence as consisting of "the failure of the System to properly function, all as more specifically set forth in ¶ 15"; ¶ 15, which appears in Count I, charges that "the System and Programs [Honeywell] provided for the plaintiff were not ready for proper installation and use . . ."

Thus the concept of a system capable of performance as soon as installed runs like a *leitmotiv* through Triangle's several theories of recovery, whether they sound in fraud, contract or negligence. That Triangle conceived of itself as having contracted for a "turn-key" system is evidenced by its simultaneous abandonment of the IBM system, in a step of such technological finality

---

**5.** Triangle concedes that the claim for breach of an oral contract is merged with claims arising out of the written contract, and no longer presses Count III.

**6.** Judge Nickerson considered that under a center of gravity test, New York law would apply to both tort and contract claims. However, Section 10.4 of the contract provided for Massachusetts law to govern, a private choice of law permitted by the Uniform Commercial

Code, § 1–105(1), if the transaction bears a "reasonable relation" to the state chosen. Judge Nickerson found it unnecessary to resolve the choice of law question because the Uniform Commercial Code, which in his view was decisive, had been adopted by both states. 457 F.Supp. at 767–8. On appeal neither party challenges the applicability of New York law, as contained in the U.C.C. or elsewhere, upon which the district court relied.

that once the Honeywell system was installed, the IBM data could not be retrieved: "Honeywell's system erased footprints."[7] Small wonder, then, that Triangle gave this response to Honeywell's interrogatory, inquiring as to which of its representations were alleged to be false:

"(i) that the defendants' system would be a 'turn-key';

"(vi) there would be a very short requirement to run parallel systems because the defendant's system was so well perfected;

"(vii) Defendant represented that prior to delivery of the System it would furnish to plaintiff output reports that would be functionally equivalent to all reports being currently run by plaintiff;

"(xix) that the defendants' System would be 'turn-key' and function immediately upon installation." (A–31–33).

▮ Given this pervasive theory of liability, the system's panic-inducing failure on its very first run, and its inability to function properly at any time after installation in January, 1971, we can only conclude with the district court that the breach occurred when the system was installed and immediately proved itself incapable. Thus Judge Nickerson was right in holding that Triangle was entitled to bring suit for breach of contract "forthwith," and that a complaint filed in August, 1975 was untimely under § 2–725(1).

Triangle argues on appeal that its use of the phrase "turnkey. operation" was possibly "ill conceived"; that the phrase does no more than paraphrase Honeywell's fraudulent inducements; and that in fact "Triangle did not contract for a turnkey operation."[8] This is a wholly unpersuasive effort to reverse course 180 degrees so as to avoid the shoals of the statute of limitations. Triangle's breach of contract claims were founded upon the proposition that Honeywell promised to install a system ready to

operate in January, 1971, and failed to do so. The fact that the word "turnkey" does not appear in the written contract is of no significance; it was clearly the governing concept, with which the written contract is wholly consistent. The district judge did not indulge in impermissible fact finding when he so construed the document; he simply read the contract in the light of Triangle's own pleadings and the deposition testimony of its president.

Nor is Triangle's entitlement to sue in January, 1971 affected by the addition of other statistical "runs" to the system subsequent to January. In the first place, the immediate and never-corrected failure of the brokers' billing run furnished adequate grounds for suit by itself. Secondly, most of the additional runs were attempted and found wanting prior to August, 1971, more than four years before commencement of suit.

▮ Triangle argues that the contract was one for services, rather than for the sale of goods; or at least the question presented a triable issue of fact precluding summary judgment. If the contract is properly viewed as one for services, and not for a sale, then the New York statute of limitations is six years, N.Y.C.P.L.R. § 213,[9] and the contract claims would be timely. *Dynamics Corporation of America v. International Harvester Co.*, 429 F.Supp. 341 (S.D.N.Y.1977). But the district court was justified in concluding, as a matter of law, that the contract was one for a sale of goods. A contract is for "service" rather than "sale" when "service predominates," and the sale of items is "incidental." *North American Leisure Corp. v. A & B Duplicators, Ltd.*, 468 F.2d 695, 697 (2d Cir. 1972). Here precisely the converse is true. Triangle bought Honeywell's equipment in the hope it would outperform IBM's equip-

---

7.  Triangle's brief at 30n.

8.  Reply brief at 11.

9.  § 213 provides:
    "The following actions must be commenced within six years:

    "2.  an action upon a contractual obligation or liability express or implied, except as provided in article 2 of the uniform commercial code; . . . ."

ment [10]—the essence of the contract was for sale of goods. While certain services by Honeywell were contemplated, the contract remains one for sale if those services were "merely incidental or collateral to the sale of goods," *Dynamics Corporation of America, supra*, at 347, clearly the case here. The contract declares itself unequivocally to be an "Agreement for the Sale of Data Processing Equipment." The district court accurately stated, at 457 F.Supp. 769:

> "The agreement with Honeywell did not contemplate that it would run a data processing service for Triangle but rather that Honeywell would develop a completed system and deliver it 'turn-key' to Triangle to operate. After the installation and training period, Honeywell personnel were to withdraw, and Honeywell's major remaining obligation was to be maintenance."

Honeywell's compensation was limited to the purchase price for the hardware; it did not bill for services prior, during or subsequent to installation. These are recognized indicia of a contract for the sale of goods, and not the rendition of professional services. *Aluminum Co. of America v. Electro Flo Corp.*, 451 F.2d 1115, 1118 (10th Cir. 1971).

While Honeywell attempted to repair the H–110 system, New York and other jurisdictions hold that attempts by the seller to remedy defects giving rise to the cause of action do not toll the U.C.C.'s four-year period of limitations. *Thalrose v. General Motors*, 8 U.C.C.Rep.Serv. 1257, *aff'd. without opinion*, 41 A.D.2d 906, 343 N.Y.S.2d 303 (1st Dept. 1973). There is authority to the contrary, see cases cited in *Zahler v. Star Steel Supply Co.*, 50 Mich. App. 386, 213 N.W.2d 269 (1973), but we have no reason to doubt that *Thalrose* states the present rule in New York, and it forecloses Triangle's argument based upon post-failure repair efforts.

Finally, Triangle relies upon the proviso to § 2–725(2) of the U.C.C., which as noted reads:

> ". . . A breach of warranty occurs when tender of delivery is made, *except where a warranty extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.*" (emphasis added).

This reliance is misplaced. We perceive nothing in the original proposal or the contract of sale (assuming the former is not merged in the latter) which would constitute "a warranty explicitly extend[ing] to future performance of the goods." But even if such warranty existed, the immediate failure of the system, and attendant manifestations of the defects now complained of, take the case out of the statutory exception.[11]

The district court correctly held that the breach of contract claims were barred by the four year limitations period in the U.C.C., § 2–725(1).

## IV.

In addition to contract claims, the complaint also pleads tort claims: some sounding in fraud, others in negligence. New York law recognizes the right to plead contract and tort causes of action arising out of

---

**10.** Triangle's president Weinstein described his company's *primary objective in replacing the IBM system with Honeywell's:*

> "There came a time when we thought we needed faster equipment and the equipment that could give us greater controls than we had had prior thereto."

A. 401.

**11.** In *Gemini Typographers, Inc. v. Mergenthaler Linotype Co.*, 48 A.D.2d 637, 368 N.Y.S.2d 210 (1st Dept. 1975), the Court construed § 2–725(2) in a closely analogous situation and said:

> "Even assuming, as plaintiff does, that there was a warranty extending to future performance, the statute would still have run. As indicated in the above-quoted statute, a cause of action for breach of warranty of future performance accrues either when the breach is discovered or when it should have been discovered. In the case at bar, the breach was discovered almost immediately upon delivery of the machine and therefore the statute of limitations, even with regard to 'future performance,' began to run from July 1965." 368 N.Y.S.2d at 212.

a single transaction, although different statutes of limitation may apply to the separate claims. See, e. g., *Sears, Roebuck & Co. v. Enco Associates, Inc.*, 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E.2d 555 (1977). Triangle's fraud claims are considered under Point V *infra*. Here we consider those claims sounding in negligence.

■ The statute of limitations in New York for negligence claims is three years. N.Y.C.P.L.R. § 214(4). A cause of action accrues when acts or omissions constituting negligence produce injury. *Schwartz v. Heyden Newport Chemical Corp.*, 12 N.Y.2d 212, 237 N.Y.S.2d 714, 188 N.E.2d 142 (1963), *cert. denied*, 347 U.S. 808 (1963). To the extent that Triangle charges appellees with negligence in the design and installation of the computer system, injury was produced by the system's initial failure in January, 1971. Accordingly the negligence claims are barred by the statute of limitations, unless there is some basis for ascribing actionable negligent conduct on the part of appellees occurring later than August 14, 1972, the complaint having been filed on August 14, 1975.

■ Triangle argues that there was evidence from which the jury could find that Honeywell's personnel continued to work on Triangle's premises, attempting to improve the performance of the system, through September, 1972.[12] From that evidence, Triangle contends that "it is entirely possible that negligence occurred" at a time within three years of the institution of suit. Accepting that possibility *arguendo*, the fact remains that a cause of action against Honeywell for negligence accrued in January, 1971. Subsequent negligence in respect of efforts to repair or improve the system is cognizable only if Triangle claimed separate injury caused by the negligent repair (e. g., that the repairs made matters worse), which is not alleged here, or if, as Triangle urges, the "continuous treatment" concept, initially applied to actions for medical malpractice, should be extended so as to embrace claims against a manufacturer of machinery. The district court refused to apply the continuous treatment concept to the case at bar. We conclude that it was correct in doing so.

The "continuous treatment" concept was first applied by the New York Court of Appeals in *Borgia v. City of New York*, 12 N.Y.2d 151, 237 N.Y.S.2d 319, 187 N.E.2d 777 (1962), which held that in a suit for malpractice of physicians and nurses in a city hospital, the statute of limitations began to run "at the end of continuous treatment or hospital-patient or physician-patient relationship," and not at the last date of malpractice. The Court in *Borgia* defined "continuous treatment" as:

" . . . treatment for the same or related illnesses for injuries, continuing after the alleged acts of malpractice, not mere continuity of a general physician-patient relationship." 12 N.Y.2d 157, 237 N.Y.S.2d 322, 187 N.E.2d 779.

The concept is thus a narrow one, proceeding from the sensible propositions that a lay patient is entitled to rely upon the professional skill of his physician, and need not be expected to interrupt a continuing course of treatment by bringing suit.[13]

Since *Borgia*, the continuous treatment concept has been extended by the New York courts to other professions;[14] but

---

**12.** Triangle brief at 24. The reference to the record is Weinstein's testimony at A. 431–432 that Honeywell personnel worked on the system "up to the installation and for two years approximately thereafter."

**13.** In *Borgia* Chief Judge Desmond articulated the rationale for the concept:

"It would be absurd to require a wronged patient to interrupt corrective efforts by serving a summons on the physician or hospital superintendent, or by filing a notice of claim in the case of a city hospital." 12 N.Y.2d 156, 237 N.Y.S.2d 322, 187 N.E.2d 779.

**14.** *Attorneys: Grago v. Robertson*, 49 A.D.2d 645, 370 N.Y.S.2d 255 (3rd Dept. 1975), citing *Gilbert Properties v. Millstein*, 33 N.Y.2d 857, 352 N.Y.S.2d 198, 307 N.E.2d 257 (1973), although the Court of Appeals' memorandum in *Gilbert* falls short of a definitive holding on the point; *Siegel v. Kranis*, 29 A.D.2d 477, 288 N.Y.S.2d 831 (2d Dept. 1968). *Accountants: Wilkin v. Dana R. Pickup & Co.*, 74 Misc.2d 1025, 347 N.Y.S.2d 122 (Sup.Ct. Allegheny Cty.

each application has depended upon that particular relationship of trust and reliance that exists between a lay plaintiff and a professional defendant.[15]

Enactments of the New York Legislature in 1975 have given rise to considerable doubt as to whether the continuous treatment concept is now applicable to any area other than medical malpractice. In that year, the Legislature enacted N.Y.C.P.L.R. § 214–a, a new section applying solely to medical malpractice, which provides:

> "An action for medical malpractice must be commenced within two years and six months of the act, omission or failure complained of *or last treatment where there is continuous treatment* for the same illness, injury or condition which gave rise to the said act, omission or failure; . . ." (emphasis added).

The Legislature also amended N.Y.C.P.L.R. § 214(6), so that the three year limitations period in respect of negligence applies to:

> "6. An action to recover damages for malpractice, *other than* medical malpractice; . . ." (emphasis added).

These amendments may reasonably be construed as reflecting the Legislature's intent to limit the "continuous treatment" concept

to the relationship from which it sprang, namely, that of patient and physician.[16]

We need not decide that particular point, however, because it is clear that whether or not the 1975 amendments limit the continuous treatment concept to cases of medical malpractice, there is wholly lacking in the case at bar that professional relationship upon which application of the doctrine, in any context, depends. Honeywell manufactured computer equipment and sold it to Triangle. As the district court correctly observed, it was never contemplated that Honeywell would undertake the continuous running of a data processing system for Triangle. Triangle personnel were trained to perform that function, and had no difficulty in observing, and complaining about, the malfunctioning of the system. It is quite true that thereafter Honeywell personnel attempted repairs to the system. However, New York law provides generally that a manufacturer's efforts at repair subsequent to delivery do not extend the contract statute of limitations, *Thalrose v. General Motors Corp., supra*; and we are not inclined to undermine that rule by clothing sellers or manufacturers of machinery in

---

1973). *Architects: County of Broome v. Vincent J. Smith, Inc.*, 78 Misc.2d 889, 358 N.Y. S.2d 998 (Sup.Ct. Broome Cty. 1974). *Quaere whether, quite apart from the questions arising out of the 1975 amendments to the N.Y.C.P. L.R., see text at note 16 infra*, the Court of Appeals would extend the continuous treatment concept as far as the lower state courts have done. Cf. *Ultramares Corp. v. Touche*, 248 N.Y. 517, 518, 162 N.E. 507 (1928), holding that accounting firms were not subject to the malpractice statute of limitations, which applies only to the misconduct "of physicians, surgeons and others practicing a profession similar to those enumerated."

15. "The client is hardly in a position to know the intricacies of the practice or whether the necessary steps in the action have been taken. For better or for worse, the client must depend on his attorney to pursue the litigation diligently and according to the rules." *Siegel, supra*, at 288 N.Y.S.2d 835. " . . . generally the client is required to rely almost totally on the professional advice of the architect. He must have confidence in the architect and place his full trust in him." *County of Broome, supra*, at 358 N.Y.S.2d 1002.

Triangle states that the "continuous treatment" doctrine was applied to "non-professionals" in *LeVine v. Isoserve, Inc.*, 70 Misc.2d 747, 334 N.Y.S.2d 796 (Sup.Ct. Albany Cty. 1972); *Colpan Realty Corp. v. Great American Insurance Co.*, 83 Misc.2d 730, 373 N.Y.S.2d 802 (Sup.Ct. Westchester Cty. 1975); and *Holdridge v. Heyer Schulte Corp.*, 440 F.Supp. 1088 (N.D.N.Y.1977). *LeVine* is not a "continuous treatment" case at all; plaintiff sued defendant manufacturer for radiation caused by a defective isotope, and the statute of limitations issue turned on when the damages could reasonably have been discovered. *Colpan* and *Holdridge* hold, on the particular facts presented, that sufficiently close analogies to the attorney-client and physician-patient relationship existed to justify application of the concept.

16. See also the Executive Department's Legislative Memorandum proposing § 214–a, which said of the amendment that it "continues the 'continuous treatment' theory in medical malpractice cases . . ." McKinney's Sess. Laws, 1975, p. 1599.

the garb of members of the learned professions.

Triangle stresses that Honeywell knew more about computer equipment than it did, and that Triangle relied upon Honeywell's expertise. But there is nothing novel in this. The manufacturer of a large, complicated, and expensive piece of machinery may be presumed to know more about its workings than the purchaser, at least in most cases. However, to lift the continuous treatment concept from its narrow origin of personal services rendered by a professional defendant to a lay patient or client, and apply it generally to the law of commercial sales, would open Pandora's box, and create uncertainty where well-defined statutes of limitations now offer repose.

We reject Triangle's appeal to the continuous treatment concept, and hold with the district court that the claims sounding in negligence are time barred.

## V.

■ We turn now to Triangle's claims which sound in fraud. The applicable statute of limitations under New York law is six years from commission of the fraud or two years from discovery, whichever is longer. *Hoff Research & Development Laboratories, Inc. v. Philipine National Bank*, 426 F.2d 1023 (2d Cir. 1970).[17]

■ Allegations of fraud appear in Counts I, II and IX of the complaint. Count I alleges that on or about January, 1970, defendant Honeywell, Inc. solicited Triangle to replace its IBM system with the Honeywell H–110 system, and, in order to induce Triangle to make such a conversion,

fraudulently represented to Triangle the capabilities of its system, Triangle relying upon such representations and entering into the contract, to its ultimate damage.

Count II, also against Honeywell, alleges that on or about December, 1970, Honeywell fraudulently advised Triangle that it was ready to introduce its system into Triangle's operations commencing January, 1971.

Count IX is against both defendants, Honeywell and H.I.S. Its main thrust is the defendants' failure to correct the system and withdrawal from attempting to do so. This is one of the "continuous treatment" counts which we considered under Point IV, *supra*. However, it also contains in ¶ 65 a blanket reference to 'material misrepresentations, concealments and misstatements of facts" fraudulently made by both defendants.

The district court applied to each of these allegations the four year contract statute of limitations, rather than the six year fraud statute, because it concluded that Triangle's fraud claims were "simply restatements of the breach of contract claim," and accordingly "should not be treated as separate claims for statute of limitations purposes." 457 F.Supp. at 770. We hold that, as to the allegation of fraud in the inducement in Count I, this conclusion was erroneous.

Honeywell relies, as did the district court, upon *Brick v. Cohn-Hall-Marx Co.*, 276 N.Y. 259, 11 N.E.2d 902 (1937), for the proposition that in applying statutes of limitation, New York courts look to the essence of plaintiff's claim and not to the form in which it is pleaded. We have no quarrel

---

**17.** This two-pronged test derives from the interaction of N.Y.C.P.L.R. § 213(9) and § 203(f). § 213(9), renumbered (8) on September 1, 1975, after commencement of this action, provides that a six year statute of limitations applies to "an action based on fraud"; the section continues:

"... the time within which the action must be commenced shall be computed from the time the plaintiff or the person under whom he claims discovered the fraud, or could with reasonable diligence have discovered it."

§ 203(f) provides:

"Time computed from actual or imputed discovery of facts. Except as provided in article 2 of the uniform commercial code, where the time within which an action must be commenced is computed from the time when facts were discovered or from the time when facts could with reasonable diligence have been discovered, or from either of such times, the action must be commenced within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer."

with the general principle, but the facts in *Brick* were entirely different. *Brick* did not involve a claim of fraud in the inducement. There the claim was that *after* the parties had entered into a contract regarding royalties for use of a certain type of package, which obligated the defendant to pay 7½ cents for each package sold and to keep accurate books and records showing the number of packages sold by it, and to render verified statements showing its package sales, the defendant "kept false books, rendered false statements and made false statements for which it did not account," thereby avoiding payment of royalties due under the contract. This clearly was a patent effort to disguise the breach of contract claim as one for fraud, in order to take advantage of a longer period of limitations in respect of fraud claims. The Court of Appeals in *Brick*, holding that the claim was time barred for failure to sue within the contract period of limitations, pointed out that:

"The falsity of these statements and the fraud of the defendant according to the allegations amounted to a breach of the contract and was no more or less a breach of the contract than if the defendant had deliberately refused to pay or had neglected to pay." 276 N.Y. at 264, 11 N.E.2d at 904.

"If there were fraud extraneous to the contract," the Court also observed, "a different situation might arise." *Ibid.*

The case at bar does not involve any such attempt to dress up a contract claim in a fraud suit of clothes. The fraud Triangle alleges in Count I consisted of independent false representations, made before there ever was a contract between the parties, which led Triangle to enter into it. In other words, Triangle clearly alleges fraud that was extraneous to the contract, rather than a fraudulent non-performance of the contract itself.

The allegations in Count I state a claim for fraud in the inducement under New York law. In *Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 386, 384 N.Y.S.2d 808 (1st Dept. 1976), plaintiff entered into an agreement with defendant establishing plaintiff as the exclusive distributor of a "light stick" device manufactured by defendant. The complaint alleged that, prior to execution of the contract in January of 1971, defendant fraudulently represented to plaintiff that it had fully tested the device, which could be produced in large commercial quantities of merchantable quality. Plaintiff further alleged that it would not have entered into the agreement, but for the fact that throughout the preliminary negotiations, defendant continuously represented that it was capable of mass producing a perfected product. Defendant argued that such statements were merely promises of future action, and did not constitute representations of fact sufficient to sustain a claim in fraud. The court disagreed, holding at 384 N.Y.S.2d 810:

"... a fair reading of the complaint affords ample basis for concluding Cyanamid's representations, concerning the state of its research and testing and its ability to produce a perfected light stick, when made, were representations of fact and not merely promises of future action. When the complaint and the contract, which it incorporates, are considered together it is apparent Coolite claims it was induced to enter into the distributorship agreement because Cyanamid represented that as a result of thorough testing it was then presently able to carry out its contractual commitment to produce commercial quantities of merchantable light sticks and that these representations were knowingly false and untrue when made. Allegations of this character are sufficient to sustain a fraud claim."

While *Coolite* was decided on a motion addressing the sufficiency of the pleadings, rather than on a statute of limitations point, the holding is pertinent to the case at bar because it demonstrates the elements of a claim for fraudulent inducement of a contract under New York law. As to those elements, we perceive no difference between the allegations in *Coolite* and the allegations in Count I of the complaint at bar. It follows that Count I adequately

**748**

pleads a claim for fraud in the inducement under New York law.[18]

 Given that sufficiency of pleading, no reason appears why the fraud period of limitations should not be applied to Count I, although the complaint also contains contract claims which are barred by the shorter limitations period. "Two or more causes of action may arise out of the same transaction with different statutes of limitations, and although one may be barred, the other may be good." *Conklin v. Draper*, 229 App. Div. 227, 241 N.Y.S. 529, 533 (1st Dept. 1930). See also *Sears, Roebuck & Co. v. Enco Associates, supra.*

 The six year period of limitations for fraud applies to a claim for fraudulent inducement of contract; "the cause of action accrues when the document is executed and when the party alleging fraud has given consideration and thus suffered damage." *Dynamics Corporation of America v. International Harvester Co., supra*, at 355 (construing New York cases). In the case at bar, the parties first entered into a contractual relationship when Triangle signed the hardware lease (subsequently replaced by the contract to purchase) on April 3, 1970. The time within which to sue on the fraudulent inducement claim could not have commenced to run prior to that date; in consequence the complaint filed in August of 1975 was timely.

 This analysis does not apply to the allegations of fraud in Counts II and IX, since they refer to alleged misrepresentations and concealments made after the parties had entered into a contractual relationship with each other. Under the rule in *Brick*, these allegations do not state separate claims for the purposes of the statute of limitations.

· Because the district court erred in applying the four year contract statute of limitations to the claim of fraud in the inducement alleged in Count I, the order and judgment dismissing the complaint must be reversed as to that Count, and the case remanded to the district court for trial only of the claim asserted against defendant Honeywell, Inc. in that Count.

The order and judgment below are accordingly reversed with respect to Count I, affirmed as to Counts II through IX and the case remanded to the district court for further proceedings consistent with this opinion.

18. See also *Terris v. Cummiskey*, 11 A.D.2d 259, 203 N.Y.S.2d 445 (3rd Dept. 1960), in which the defendant seller's false statement, prior to the signing of a contract for sale of a house, that after occupancy the cellar would be dry was held sufficient, together with the other elements of fraud, to constitute fraud in the inducement.