**ACCUSYSTEMS, INC. and William M. Selden, Plaintiffs,**

v.

**HONEYWELL INFORMATION SYSTEMS, INC., Defendant.**

**No. 80 Civ. 5710 (DBB).**

United States District Court, S.D. New York.

Feb. 7, 1984.

Thomas K. Christo, North Hampton, N.H., Robert G. Watson, Framingham, Mass., and Thomas A. Holman, Lipsig, Sullivan & Liapakis, New York City, for plaintiffs.

Davis, Polk & Wardwell, New York City, for defendant; Robert B. Fiske, Jr., James D. Liss, Robert M. Buschmann, New York City, of counsel.

## OPINION

BONSAL, District Judge.

Plaintiffs, AccuSystems, Inc. ("AccuSystems"), a New York corporation, and its founder and sole shareholder, William M. Selden ("Selden"), instituted this diversity action on October 8, 1980 against Honeywell Information Systems, Inc. ("Honeywell"), a Delaware corporation. Plaintiffs seek damages for fraud, negligence, and breach of contract arising out of the sale by Honeywell of computer hardware and software to AccuSystems. Following discovery, Honeywell moved for summary judgment dismissing the complaint. By Memorandum filed October 26, 1982 Honeywell's motion for summary judgment was granted with respect to the contract claims and denied in all other respects. The issues of fraud and negligence were tried to the court in September-October, 1983.

## FACTS

Selden has been in the computer business for a number of years. He was employed by International Business Machines between 1954 and 1964 where he participated in software product development and taught computer science. In 1964 he became Chairman of the Board of Electronic Accounting Systems ("EAS"), a Delaware corporation in which he acquired a stock interest. EAS operated a computer service bureau[1] in Rochester, New York and provided its customers with computer processed payroll reports, checks, and other general accounting data. EAS was an Original Equipment Manufacturer ("OEM")[2] for Entrex computer equipment. In April, 1977 EAS asked Selden to conduct a study for EAS to determine what new computer equipment EAS might purchase for its service bureau business. During the summer of 1977 Selden, on behalf of EAS, met with Honeywell representatives and discussed upgrading EAS' payroll services through the use of Honeywell computers and related software. The discussions focused upon the possible use by EAS of a Honeywell computer consisting of hardware known as Level 6, and its related software, the TL–6 operating system. The TL–6 was developed by the Minicomputer Marketing Organization ("MMO"), a division of Honeywell.

On August 23, 1977 Beard, a Honeywell salesman, spent 24 hours with Selden in Rochester observing EAS' payroll processing operations being run by another Honeywell computer. Selden told Beard that he needed a system to perform similar operations on a larger scale; a system which

---

1. A service bureau is a company which uses its own computer system to process applications for customers who do not have computer systems.

2. An OEM is a company which purchases hardware (the physical elements in the computer, such as integrated circuits, wires, and terminals. Douglas Downing, *Encyclopedia of Computer Terms*, 78 (1983)) and systems software (machine readable instructions in written and electromagnetic form which enable a computer system to function) from a vendor and adds value, in the form of applications software or other components, and then resells both the hardware and software at a markup to end users. An OEM is thus a type of middleman in the computer business.

would support 32 terminals on line, and which would perform complicated multitasking. Beard represented to Selden that the Level 6 and the TL–6 operating system would support 32 terminals on line but advised that the number be kept down to around 20 to achieve faster response time. Around this time and on through early November, 1977 several Honeywell officials told Selden that the TL–6 operating system had been extensively tested and furnished to other locations where it was working well. Following these representations and other discussions with Honeywell sales people and technical people, Selden recommended to EAS that it purchase the Level 6 hardware and related TL–6 software. However, in September 1977 EAS decided not to make the purchase, and Selden told Honeywell that he was considering forming a new company to do so. Honeywell promised Selden that the new company would receive technical support from Honeywell in a joint effort to refine and improve the product if the new company should purchase it. Further discussions took place between Honeywell, Selden and Selden's associate Jay Shelley, in the course of which Honeywell told Selden that the new company might act as a test site for the TL–6. Later, Beard told Selden that the company Selden proposed to form could not become a test site because the test sites had already been selected; however, that the new company could become an OEM and could receive a discounted price and increased technical support.

In November, 1977 Selden formed AccuSystems. On November 21, 1977 Selden, as president of AccuSystems, signed three contracts written on Honeywell forms:

The first contract was entitled "OEM Agreement for Computer Equipment, Services and Software Products between Honeywell Information Systems Inc. and AccuSystems, Inc." This contract warranted that the equipment sold by Honeywell would be free from defects in workmanship or material under normal use and service

for 30 days and limited Honeywell's liability in contract, tort, or otherwise to the repair or exchange of parts returned to Honeywell and found by Honeywell to be defective. It stated that Honeywell would not be liable for any indirect, special or consequential damages. Finally, it provided that "No action ... arising out of this Agreement may be instituted by ... Customer more than 2 years after the cause of action has arisen ...."

The second contract was entitled "OEM Software Product License Supplement." This contract limited Honeywell's liability to AccuSystems in contract, tort or otherwise for any software product licensed to AccuSystems to 10% of the charges paid by AccuSystems to Honeywell for each applicable software product, or $5,000, whichever was less.

The third contract was entitled "Maintenance Service Agreement for Data Processing Equipment between Honeywell Information Systems, Inc. and AccuSystems, Inc." This contract limited Honeywell's liability in contract, tort, or otherwise to the repair or exchange of parts returned to Honeywell and found by Honeywell to be defective, and provided that Honeywell would not be liable for any indirect, special or consequential damages. Like the OEM contract, any action must be brought within two years.

All three contracts were signed on January 17, 1978 by G.W. Shipman, Director, Minicomputer Marketing Operations, on behalf of Honeywell, and are hereafter collectively referred to as "the Agreement."

In his testimony, Selden described AccuSystems as having two purposes when it entered into the Agreement: (1) to serve as an OEM for Honeywell; that is, to purchase hardware and software from Honeywell, add value to it, and resell to end users; and (2) to itself act as an end user by functioning as an independent service bureau for small businesses.[3]

**3.** It appears that AccuSystems sought to use the system in its service bureau business—it does not appear that AccuSystems ever acted as an OEM.

The Level 6 hardware was delivered to AccuSystems in Avon, New York on February 2, 1978 and was installed by Honeywell representatives on February 6, 1978. The TL–6 software was installed at AccuSystems on March 21, 1978.

Honeywell issued a document dated February 15, 1978 entitled "Preliminary—Honeywell Transactional Level 6 Concepts & Facilities" (hereafter referred to as the February 15 document), a copy of which was furnished to AccuSystems. The document states, on page 2, that it is "Preliminary—For Internal Use Only." In the introduction it is stated that "[t]he Level 6 minicomputer with the associated TL6 operating system software is a total product offered for commercial users." Then follow paragraphs describing the features which System Builders (OEMs) require and how TL–6 meets these requirements. Included in these requirements is "Stability —A System Builder should not have to spend time trying to figure out why a seemingly bug-free program does not work as it is supposed to work." As to stability, it is stated that the "TL6 evolved from prior operating systems and went through elaborate testing procedures at all stages of development." With respect to "multitasking," the importance of which Selden had stressed with Honeywell during their discussions, the document states that the "TL6 was built in compliance with the principle that the processing of any number of tasks in any combination may occur simultaneously. TL6 provides data integrity protection and efficient usage of core which is dynamically allocated according to current priorities" and that the "TL6 truly responds to application design considerations which fully employ the concept of multitasking in an interactive mode."

At the trial, John Kallunki, who worked at Honeywell as a design programmer for software, admitted that no recorded testing occurred until more than one year after Honeywell sold the TL–6 to AccuSystems. These tests established that the TL–6 ran at a high risk and produced below average quality when processing mixed-mode, multi-user transactions.

Following installation, AccuSystems experienced numerous difficulties with the Honeywell Level 6 and TL–6. Selden testified that Honeywell's initial shipment of hardware was incomplete and that the machine would not function when turned on. Selden stated that he ordered additional parts but that they did not work when they arrived and that these hardware difficulties continued until May, 1978. Selden stated that beginning in August, 1978 the system "crashed" while running programs.

Throughout this period, Selden, on behalf of AccuSystems, repeatedly expressed his dissatisfaction to Honeywell. For example, on May 22, 1978 AccuSystems addressed a letter to Beard at Honeywell in which it stated:

If we were to assume that under normal conditions the month of February would be required to get the system installed and broken in, it follows that we suffered unusual impairment for March, April, and the first part of May ... We relied on the reputation of the Honeywell Company and the advice of representatives of Honeywell in placing our order for the Level "6" machine.... We did, however, rely upon the Honeywell Company being reasonably effective in making reasonable efforts to rectify the problems we encountered, a case for material measurable damages of up to $17,-000.... In spite of that experience, but because of the longer background we have had and the reputation of Honeywell, and also because of the personal responses I have received from you, I am today still looking forward to basing my company's growth on Honeywell products and relying upon a continued cordial relationship with Honeywell people at all levels. I am, therefore, not at this moment contemplating a law suit on the grounds of Honeywell's failure to furnish a working computer; ....

Despite the representations made by Honeywell, many of which were later repeated in its February 15, 1978 document, AccuSystems continued to encounter seri-

ous difficulties in making the system work. On August 16, 1978 Selden sent the following telegram to officials of Honeywell:

> Preparing suit today for compensatory and punitive damages suffered as a result of Honeywell's massive mismanagement. This action being taken in light of acknowledged total breakdown of Honeywell's control program known variously as TL6 and Operating System 200. This admission comes as the culmination of nine months failure on Honeywell's part to fulfill any of its contractual obligations to deliver operable computer systems including hardware, control programs, compilers and service.
>
> Because the bulk of my company's work since its inception has been necessarily devoted to finding and solving Honeywell's hardware and software problems I know the technical steps needed to resolve the present impasse. I am also aware of the adverse effects on my business of the publicity attendant upon our proposed lawsuit. Since the alternative is to go out of business, there seems no other remedy than the law for Honeywell's immovable finger trouble.
>
> Regretfully, William M. Selden, President
>
> AccuSystems Inc.

The next day, AccuSystems' attorneys in Rochester addressed a letter to the president of Honeywell, stating, "This letter will expand on the telegram from William Selden, the President of AccuSystems." The letter described the problems which were being encountered by AccuSystems, sought compensation for AccuSystems' losses, and requested a guarantee from Honeywell that immediate steps would be taken to correct the problems.[4]

In August, 1978 AccuSystems moved its office from Avon to New York City. Selden testified that AccuSystems wanted to establish a service bureau to service small businesses such as restaurants.

While the evidence indicated that the Level 6 operated satisfactorily after the telegram and letters above described, the TL–6 did not. The system crashed when AccuSystems sought to use it for large programs or when several terminals were to be used simultaneously. At one point AccuSystems was told by Honeywell that it could correct the difficulties it was experiencing with the TL–6 if it purchased more memory. AccuSystems did so at a cost of $10,000, but this did not improve the system's performance.

The denouement came on May 15, 1979 when Viswanathan, a member of the Honeywell team which had developed the TL–6, told Selden that adding more memory to the Level 6 would not improve the system's performance; that this severe limitation on the TL–6 was a design problem that could not be rectified by patches. Selden testified that he was stunned to learn this from Viswanathan.

At this point, Selden knew without a doubt that the system which he had purchased from Honeywell did not live up to the representations which had been made to him before AccuSystems entered into the Agreement and which were repeated in Honeywell's February 15 document. AccuSystems continued its efforts to make the system operate until it went out of business in late 1982. Selden testified that during this period AccuSystems began using MOD 400, another Honeywell operating system, in its service bureau business.

Plaintiffs instituted this action on October 8, 1980. Honeywell counterclaimed for the unpaid balance of the purchase price owed by AccuSystems, but dropped its counterclaim at trial.

---

**4.** Despite Selden's complaints about AccuSystems' problems with the TL–6, sometime in August, 1978 Selden told Honeywell officials that "Honeywell support has been more than adequate, in fact it surpassed that normally provided or required.... we got an awful lot of support." Earlier, in a June 9, 1978 letter to the Director of Honeywell's Field Engineering Division, Selden stated, "We have always found the Field Engineering service to be promptly responsive ... We have had outstanding response from the TL–6 group who are developing the operating system we are using."

## DISCUSSION

### Choice of Law

■ Jurisdiction is based upon diversity of citizenship. This court therefore applies the choice of law rule of New York, the forum state, in determining the applicable substantive law. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). New York courts apply the law of the state having the "greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson*, 12 N.Y.2d 473, 481, 191 N.E.2d 279, 283, 240 N.Y.S.2d 743, 749 (1963). *But compare Cousins v. Instrument Flyers, Inc.*, 44 N.Y.2d 698, 699, 376 N.E.2d 914, 915, 405 N.Y.S.2d 441, 442 (1978) (*lex loci delicti* remains the general rule in tort cases to be displaced only in extraordinary circumstances).

The OEM and maintenance contracts (which are part of the Agreement) provide that they are governed by the law of the Commonwealth of Massachusetts, and there is evidence that several meetings were held in Honeywell's Massachusetts locations. The provisions in the contracts are not determinative since the alleged fraudulent misrepresentations were made in New York before the Agreement was entered into. *Tort Theories In Computer Litigation*, 38 Rec.A.B. City N.Y. 426, 440–41 (1983) (fraud in the inducement should negate the provisions of a written contract at the behest of an injured plaintiff); U.C.C. § 2–721 (1978); Restatement (Second) Contracts § 164 (1981); Restatement (Second) Conflict of Laws § 187(2) (1971). *See also* Reese, *Choice of Law in Torts and Contracts and Directions for the Future*, 16 Colum.J. Transnat'l L. 1, 22, 23 (1977).

■ The evidence with respect to plaintiffs' claims of negligence and fraud relates to events which occurred in New York. The representations challenged as fraudulent were made in New York to Selden, a New York resident, and to AccuSystems, a New York corporation doing business in New York, before the Agreement was entered into. The system was delivered in New York and was expected to operate in New York. Both sides have relied on the law of New York in their briefs. Moreover, New York has a strong interest in applying its law where fraud upon its domiciliaries is alleged. Restatement (Second) Conflict of Laws § 148(1) (1971).

After weighing the relative interests of Massachusetts and New York, the court believes that a New York court would apply New York law here. Therefore, this federal court will apply New York law.

### Negligence

Plaintiffs' negligence claim is based on representations allegedly made by Honeywell which induced plaintiffs to enter into the Agreement, and on Honeywell's failure to properly service the system it sold to AccuSystems. Plaintiffs contend that Honeywell, in providing advice and assistance to plaintiffs, assumed a duty of care toward plaintiffs apart from any duty arising out of the Agreement. That duty was allegedly breached in numerous ways, principally as a result of Honeywell's failure to recognize and correct a variety of defects in the TL–6 operating system it sold to AccuSystems.

Honeywell denies that it was negligent and asserts that plaintiffs' negligence claim is merely a breach of warranty claim in disguise and that breach of warranty claims are barred by the Agreement. Moreover, Honeywell maintains that any negligence claim is time-barred by the two-year limitation in the Agreement. Honeywell contends that at no time was it negligent in performing the services it rendered to plaintiffs. Finally, Honeywell points out that "negligent misrepresentations" are not actionable in New York.

■ New York courts do not recognize a cause of action for negligent misrepresentation in the absence of some special relationship of trust or confidence between the parties. *Tort Theories In Computer Litigation*, 38 Rec.A.B. City N.Y. 426, 432 (1983); *International Products Co. v. Erie R.R.*, 244 N.Y. 331, 155 N.E. 662 (1927).

The buyer-seller relationship between AccuSystems and Honeywell did not entail the degree of trust required to support a cause of action for negligent misrepresentation. *Tort Theories In Computer Litigation*, 38 Rec.A.B. City N.Y. 426, 432 (1983); *Dorsey Products Corp. v. U.S. Rubber Co.*, 21 A.D.2d 866, 251 N.Y.S.2d 311 (1st Dept. 1964), *aff'd*, 16 N.Y.2d 925, 212 N.E.2d 435, 264 N.Y.S.2d 917 (1965).

■ The evidence does not establish that Honeywell was negligent in its dealings with plaintiffs after the Agreement was entered into. Although plaintiffs complain that the support by Honeywell was inadequate, Selden testified that in August, 1978 he told Honeywell officials that "Honeywell support has been more than adequate, in fact it surpassed that normally needed or required ... we got an awful lot of support." Honeywell supplied plaintiffs with field engineers who attempted to solve problems plaintiffs encountered. In a letter to Honeywell's Field Engineering Director, dated June 9, 1978, Selden stated, "We have always found the Field Engineering service to be promptly responsive ...." The support and responsiveness Selden stated Honeywell gave plaintiffs does not indicate any negligence on Honeywell's part. Therefore, plaintiffs' negligence claim is not supported by the evidence and is dismissed. *Halverson v. 562 West 149th Street Corp.*, 290 N.Y. 40, 47 N.E.2d 685 (1943); 41 N.Y.Jur. *Negligence* § 15 (1965).

*Fraud*

Count I of the complaint alleges that from June through November, 1977 defendant Honeywell fraudulently misrepresented to Selden and AccuSystems the capabilities of the TL–6 systems software as well as the amount of testing the system had undergone. It alleges that Selden and AccuSystems relied on Honeywell's representations by entering into the Agreement, to their damage.

Selden testified at the trial that prior to AccuSystems' entering into the Agreement:

(1) Beard, a Honeywell salesman, spent 24 hours with Selden in Rochester on August 23, 1977 observing EAS' payroll processing operations being run by another Honeywell computer. Selden told Beard that he needed a system to perform similar operations on a larger scale; a system which would support 32 terminals on line, and which would perform a number of tasks simultaneously. Beard represented to Selden that the Level 6 and the TL–6 operating system would support 32 terminals on line but advised that the number be kept down to around 20 to achieve faster response time.

(2) Selden was told by a number of Honeywell officials that the TL–6 operating system had been extensively tested.

(3) Selden was told that the TL–6 operating system had been installed in a number of other locations where it was functioning well.

(4) Selden informed Honeywell of his particular interest in an operating system which would do complicated multitasking and was informed that the Level 6 and TL–6 operating system would do this.

After the Agreement was entered into, these representations were repeated by Honeywell in a document dated February 15, 1978 entitled "Preliminary—Honeywell Transactional Level 6 Concepts & Facilities," a copy of which was delivered to Selden and AccuSystems. This document described the Level 6 hardware along with the TL–6 operating system as a "total product offered for commercial users" and stated that the "TL6 evolved from prior operating systems and went through elaborate testing procedures at all stages of development." The document further stated that the "TL6 was built in compliance with the principle that the processing of any number of tasks in any combination may occur simultaneously" and that the "TL6 truly responds to application design considerations which fully employ the concept of multitasking ...."

The trial testimony established that the TL–6 operating system failed when more than three terminals were in operation; that the TL–6 operating system could only

process simple programs; that AccuSystems was the first installation site for the TL–6 operating system; that no recorded tests of the TL–6 were conducted by Honeywell until more than a year after the sale to AccuSystems; and that when these tests were conducted, they established that the TL–6 ran at a high risk and produced below average quality when processing mixed-mode, multi-user transactions.

For plaintiffs to sustain their cause of action for fraud in the inducement, they must show that Honeywell made a representation of fact which was known by Honeywell to be untrue or recklessly made, offered to deceive plaintiffs and to induce them to act upon the representation, causing injury. *JoAnn Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 250 N.E.2d 214, 302 N.Y.S.2d 799 (1969). Plaintiffs must produce clear and convincing evidence of the fraud. *Ajax Hardware Manufacturing Corp. v. Industrial Plants Corp.*, 569 F.2d 181, 186 (2d Cir.1977); *Manchel v. Kasdan*, 286 A.D. 483, 144 N.Y.S.2d 694 (1st Dept.1955) (per curiam), *aff'd* 1 N.Y.2d 734, 134 N.E.2d 687, 151 N.Y.S.2d 940 (1956); *Cave v. Green*, 281 A.D. 560, 120 N.Y.S.2d 865 (1st Dept.1953), *aff'd*, 308 N.Y. 754, 125 N.E.2d 109 (1955).

In view of the foregoing, the court concludes that the representations made by Honeywell to plaintiffs prior to the Agreement were known by Honeywell to be false or made recklessly without knowing whether they were true or false, in order to induce plaintiffs to enter into the Agreement. Honeywell acted with scienter. *Morse v. Swank, Inc.*, 459 F.Supp. 660, 667 (S.D.N.Y.1978); *Coolite Corp. v. American Cyanamid Co.*, 52 A.D.2d 486, 384 N.Y.S.2d 808 (1st Dept.1976); 24 N.Y.Jur. *Fraud and Deceit*, § 150 (1962). The representations that the TL–6 operating system had been extensively tested and could concurrently perform multiple tasks for multiple users were representations of fact and not merely promises of future action or statements of intent. *Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d

737, 747 (2d Cir.1979), *aff'd after remand*, 651 F.2d 132 (2 Cir.1981); *Coolite Corp. v. American Cyanamid Co., supra.*

Honeywell points out that Selden had prior computer experience with IBM and with EAS, and suggests that plaintiffs' reliance was not reasonable. However, there is no doubt that the TL–6 operating system represented a departure from other systems with which Selden may have been familiar. Moreover, the court finds that since this is a dynamically growing industry, Selden's reliance on Honeywell's representations with respect to the TL–6 operating system was reasonable. Indeed, plaintiffs have produced "clear and convincing" evidence, and the court finds that plaintiffs have proved that they were fraudulently induced to enter into the Agreement.

Having found that plaintiffs were fraudulently induced to enter into the Agreement, it becomes necessary to consider Honeywell's defense that plaintiffs' fraud claim is time-barred by the Agreement. The OEM contract and the Maintenance Service contract contained in the Agreement both provide that: "No action in any form arising out of this Agreement may be instituted by Honeywell or Customer more than 2 years after the cause of action has arisen, or in the case of nonpayment, more than 2 years from the date of last payment." The two-year limitation period contained in the Agreement does not time-bar plaintiffs' claim for fraud in the inducement. *Tort Theories In Computer Litigation*, 38 Rec.A.B. City N.Y. 426, 440–41 (1983) (fraud in the inducement should negate the provisions of a written contract at the behest of an injured plaintiff); U.C.C. § 2–721 (1978); Restatement (Second) Contracts § 164 (1981). Therefore, the New York statute of limitations will be applied, which provides that claims may be brought within six years from the commission of the fraud or within two years from discovery, whichever is longer. *Triangle Underwriters, Inc. v. Honeywell*, 604 F.2d 737, 746 (2d Cir.1979), *aff'd after remand*, 651 F.2d 132 (2 Cir.1981); N.Y.C.P.L.R. §§ 203(f), 213(8). On May 15, 1979 Selden

discovered that the TL–6 operating system would not work as had been represented by Honeywell. Plaintiffs' complaint was filed October 8, 1980, within six years of the time that the representations were made and relied upon and within two years from the time the fraud was allegedly discovered, and is therefore timely.

*Damages*

 Since plaintiffs were induced to enter into the Agreement by the fraudulent misrepresentations of Honeywell, they are entitled to damages. The evidence establishes that on May 15, 1979 Selden realized that the TL–6 system would not work and that the representations which had been made to him prior to the signing of the Agreement were false. Plaintiffs are entitled to damages for their actual pecuniary loss sustained as a direct result of the wrong. *Hanlon v. MacFadden Publications, Inc.*, 302 N.Y. 502, 511, 99 N.E.2d 546, 551 (1951); *Ungewitter v. Toch*, 31 A.D.2d 583, 294 N.Y.S.2d 1013, 1015 (2d Dept.1968), *aff'd*, 26 N.Y.2d 687, 257 N.E.2d 40, 308 N.Y.S.2d 858 (1970).

However, plaintiffs took no steps to mitigate their damages. Indeed, they continued to experiment with the TL–6 system and the MOD 400 system until AccuSystems went out of business late in 1982. In view of the disclosure on May 15, 1979, plaintiffs could have terminated their efforts to make the TL–6 system operate and sought other equipment which would enable them to continue in business. Having failed to do so, they cannot hold Honeywell responsible for damages after that date. *Wilmot v. State*, 32 N.Y.2d 164, 168–69, 297 N.E.2d 90, 92, 344 N.Y.S.2d 350, 352–53 (1973); *Mayes Co. v. State*, 18 N.Y.2d 549, 554, 223 N.E.2d 881, 883, 277 N.Y.S.2d 393, 397 (1966) (per curiam); *AMF, Inc. v. Cattalani*, 77 A.D.2d 779, 430 N.Y.S.2d 731, 733 (4th Dept.1980). Plaintiffs' damages are therefore limited to their actual pecuniary loss sustained as a direct result of Honeywell's fraud to and including May 15, 1979.

 Plaintiffs are not entitled on their fraud claim to damages for loss of profits. *Reno v. Bull*, 226 N.Y. 546, 548, 124 N.E. 144, 146 *reh. den.*, 227 N.Y. 591, 125 N.E. 924 (1919); *AFA Protective Systems, Inc. v. American Telephone and Telegraph Co.*, 57 N.Y.2d 912, 914, 442 N.E.2d 1268, 1269, 456 N.Y.S.2d 757, 758 (1982). Nor does Honeywell's conduct here justify the imposition of punitive damages. The evidence does not establish that the false representations were made maliciously or wantonly or that Honeywell's conduct was actuated by evil motives. Though Honeywell's representations were false and recklessly made, it is likely that Honeywell thought that Selden, with his prior experience, might somehow make the system work. Therefore, the court finds that the moral culpability required for an award of punitive damages is not present here. *Rosenberg v. GWV Travel, Inc.*, 480 F.Supp. 95 (S.D.N.Y.1979); *Walker v. Sheldon*, 10 N.Y.2d 401, 404, 179 N.E.2d 497, 498–99, 223 N.Y.S.2d 488, 490 (1961); *Borkowski v. Borkowski*, 39 N.Y.2d 982, 355 N.E.2d 287, 387 N.Y.S.2d 233 (1976).

The only evidence bearing on damages which came out at the trial was the following:

Selden testified that plaintiffs paid $10,-000 for the additional memory that Honeywell delivered to AccuSystems in February, 1979, and that as of May 15, 1979 plaintiffs had paid approximately $40,000 to Honeywell in payment of various bills.

AccuSystems' tax returns for 1978 and 1979 were introduced at the trial, which showed that AccuSystems had a loss of $119,083 in 1978 and $283,383 in 1979. There was evidence that Selden's income for 1978 was $2,475 and for 1979 was $17,-800.[5]

These figures do not enable the court to determine the damages to which plaintiffs

---

**5.** In Count One of the complaint plaintiffs seek damages as follows: Selden demands restitution of $536,500 invested in AccuSystems. AccuSystems seeks refund of $35,000 paid for hardware and systems software, and $300,000 as restitution.

are entitled. Therefore, a hearing on damages will be held at the United States Courthouse, on a date to be agreed upon by the court and counsel, to determine damages, following which judgment will be entered in favor of the plaintiffs in the amount so determined.

The foregoing constitutes the court's findings of fact and conclusions of law. Rule 52(a), Fed.R.Civ.P.

It is So Ordered.