73 F.3d 238
 96 Cal. Daily Op. Serv. 15, 96 Daily Journal
D.A.R. 48
A.T. KEARNEY, INC., a Delaware Corporation, Plaintiff-Appellant,
v.
INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York
Corporation, Defendant-Appellee.
 Nos. 94-35890, 94-36183.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 14, 1995.
Decided Dec. 29, 1995.
 
 R. Daniel Lindahl, Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Oregon, for plaintiff-appellant.
 Michael H. Simon, Perkins Coie, Portland, Oregon, for defendant-appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before: BROWNING, RYMER and T.G. NELSON, Circuit Judges.
 T.G. NELSON, Circuit Judge:
 
 
 1
 A.T. Kearney, Inc. ("Kearney"), a management consulting firm with expertise in systems technology, was retained by Fred Meyer ("FM") to develop a management information system ("MIS" or "the System") for FM stores. The MIS devised by Kearney employed International Business Machines Corporation ("IBM") mid-size computers. When new FM management decided the System was a failure, FM sued Kearney. The parties eventually settled. While the action was pending, Kearney brought suit against IBM in state court alleging negligence and negligent misrepresentation to itself and FM and claiming contribution and indemnity from IBM. IBM successfully petitioned for removal to federal court, where it moved for, and was granted, summary judgment. Kearney timely appeals the dismissal of its negligence and contribution claims.[1] We have jurisdiction under 28 U.S.C. Sec. 1291, and we affirm.
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 2
 In 1989, FM, a retailer offering consumers the convenience of "one-stop shopping" for a wide range of goods, hired Kearney, an information systems consultant, to advise it in overhauling its computer system. FM's then-CEO, Steve Stevens, sought with Kearney's help to implement a new, decentralized management system at FM. FM and Kearney took bids from a number of computer hardware vendors in May 1989, including IBM. IBM submitted a proposal which included use of a mainframe computer at FM headquarters, but FM and Kearney rejected this proposal as not in keeping with its decentralized plan.
 
 
 3
 In October 1989, Kearney suggested FM use a "distributed" MIS architecture, which did not include use of a mainframe. It advised FM to install IBM AS/400 mid-size computers at the stores and headquarters, a decision which Kearney admits was "unusual because large companies such as Fred Meyer always used mainframe computers, rather than mid-size computers, to handle headquarters operations." However, Kearney assured FM that the System would be viable and cost-efficient. At least two IBM employees questioned the decision to use only mid-size computers in the System, but they did not disclose their reservations to FM or to Kearney.
 
 
 4
 FM accordingly purchased approximately one hundred AS/400 computers from IBM under the provisions of a twenty-three page contract. The sales contract explicitly excluded "warranties of merchantability and fitness for a particular purpose." IBM and Kearney had no contractual relationship. Incident to the sale, IBM provided FM with installation assistance, technical support and the benefit of its expertise. Thirteen IBM employees were installed at FM headquarters for the purpose of helping Kearney and FM get the System up and running. The parties agree that IBM was compensated only for the purchase price of the computers and that IBM neither sought nor received compensation for consultation or any other services.
 
 
 5
 In January 1991, Steve Stevens was removed as FM's CEO. FM's new management team reviewed the MIS and found it wanting. FM subsequently ended its relationship with Kearney and installed an IBM mainframe computer at its headquarters. In September 1991, FM sued Kearney for $14 million in damages for breach of contract, negligence, negligent misrepresentation and breach of fiduciary duty. In October 1992, FM amended its complaint to seek $110 million in damages. Kearney admitted no wrong, but settled with FM in December 1992 for $13.25 million.
 
 
 6
 While the dispute with FM was ongoing, Kearney filed an indemnity suit against IBM in Oregon state court. IBM removed the case to federal court, and later moved for summary judgment. The district court granted summary judgment to IBM and dismissed as moot Kearney's cross-motion for summary judgment and IBM's motion to strike certain evidence. See A.T. Kearney, Inc. v. International Business Machines Corp., 867 F.Supp. 943 (Or.1994). Kearney timely appeals.
 
 ANALYSIS
 
 7
 We review a grant of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), pet. for cert. filed, Sept. 20, 1995; Jesinger v. Nevada Federal Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). Our review is governed by the same standard used by the trial court under Fed.R.Civ.P. 56(c). Jesinger, 24 F.3d at 1130. We must determine, viewing the evidence in the light most favorable to Kearney, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id.
 
 
 8
 Oregon statutory law allows for contribution "where two or more persons become jointly or severally liable in tort for the same injury to person or property...." Ore.Rev.Stat. Sec. 18.440(1). Citing this statute, Kearney states at the beginning of its argument that its contribution claim against IBM "depends upon establishing IBM's liability in tort to Fred Meyer." However, Kearney also predicates its case on IBM's liability to Kearney under a "special relationship" theory.
 
 
 9
 Kearney argues that IBM is liable in tort to FM, and thus liable for contribution to Kearney, based on its negligent failure to inform FM of its doubts concerning the suitability of its mid-size computers for FM's purposes. Kearney further argues that IBM had a duty to inform Kearney of its doubts because of the special relationship between them. Thus, Kearney has both a derivative claim based on IBM's alleged duty to FM, and a direct claim based on IBM's alleged duty to Kearney. In its briefs, Kearney stressed the derivative claim: "The real issue before this court ... is whether a company that provides a range of goods and services in connection with a multi-million dollar information systems project has a duty to avoid making misrepresentations to its customers." At oral argument, however, Kearney clarified the dual nature of its claims. We consider both claims subsequent to our review of pertinent Oregon law.
 
 
 10
 As a preliminary matter, we observe that IBM's alleged liability in tort rests on the issue of whether or not it owed a duty to either FM or to Kearney to avoid negligent misrepresentation. Because we find IBM owed no such duty to either FM or Kearney, we do not reach the question of breach. The Oregon Supreme Court has held that duty is a legal issue to be decided by the court. Fazzolari v. Portland School Dist. No. 1J, 303 Or. 1, 734 P.2d 1326, 1328 (1987) (In Banc). We therefore reject Kearney's assertion that the issue must be sent to a jury. We also reject Kearney's argument that the existence of a special relationship is a factual issue separate from the issue of duty, requiring a decision by a jury.
 
 
 11
 Under Oregon common law, as set out by the Oregon Supreme Court in the seminal case of Onita Pacific Corp. v. Trustees of Bronson, tort claims for purely economic loss "must be predicated on some duty of the negligent actor to the injured party beyond the common law duty to exercise reasonable care to prevent foreseeable harm." 315 Or. 149, 843 P.2d 890, 896 (1992) (In Banc). The Oregon Supreme Court held that while one " 'ordinarily is not liable for negligently causing a stranger's purely economic loss without injuring his person or property,' " id. (quoting Hale v. Groce, 304 Or. 281, 283, 744 P.2d 1289 (1987)), "under some circumstances, one may be liable for economic loss sustained by others who rely on one's representations negligently made." Id. The court defined "economic losses" as "financial losses such as indebtedness incurred and return of monies paid, as distinguished from damages for injury to person or property." Id. at n. 6.[2]
 
 
 12
 Rather than adopt a black letter rule on the issue of when to ascribe tort liability in cases of economic loss, the Oregon Supreme Court "opt[ed] to develop the scope of the duty and the scope of recovery on a case-by-case basis." Id., 843 P.2d at 896. Questions of liability are to be resolved by "examin[ing] the nature of the parties' relationship and compar[ing] that relationship to other relationships in which the law imposes a duty on parties to conduct themselves reasonably, so as to protect the other parties to the relationship." Id.
 
 
 13
 The court listed the following as examples of relationships to which the Oregon common law ascribes a special duty of care: attorney-client, engineers or architects to their beneficiaries, agent-principal, and primary insurer to excess insurer and insured. Id., 843 P.2d at 896-97. The court also indicated that "nongratuitous suppliers of information owe a duty to their clients or employers or to intended third-party beneficiaries of their contractual, professional, or employment relationship to exercise reasonable care to avoid misrepresenting facts." Id., 843 P.2d at 899.
 
 
 14
 In such relationships, which might be termed "special relationships," the professional who owes a duty of care "is, at least in part, acting to further the economic interests of the 'client,' the person owed the duty of care." Id., 843 P.2d at 897. At the other end of the spectrum are relationships involving "two adversarial parties negotiating at arm's length to further their own economic interests." Id. In the latter situation, "economic losses arising from a negligent misrepresentation are not actionable." Id. (emphasis added).
 
 
 15
 The court characterized "arm's length" adversaries not as hostile or aggrieved parties, but as "business adversaries in the commercial sense." Id., 843 P.2d at 899. To explain its reasoning, the court cited Professor Alfred Hill, distinguishing between commercial adversaries and suppliers of information to the general public:
 
 
 16
 "When the aggrieved person is a buyer, who does not complain of the negligent performance of a service but rather of misrepresentation by a seller inducing the making of a contract, the conceptual mold has been different from the inception of modern contract law: the options have been to sue on the contract or to sue in deceit, without a middle ground consisting of actionable negligence."
 
 
 17
 Id., 843 P.2d at 898 (quoting Hill, Damages for Innocent Misrepresentation, 73 Column.L.Rev. 679, 688 (1973)). The court agreed with Professor Hill that "allowing recovery for negligent misrepresentations made in the bargaining process would undermine the law of contracts...." Id. (citing Hill, supra, at 717-18.)
 
 
 18
 IBM maintains, and the district court held as a matter of law, that its role was purely that of vendor, or commercial adversary under Onita. As such, IBM owed FM no duty beyond that specified in the contract, which disclaims, inter alia, warranty of fitness for a particular purpose. Kearney argues that IBM, FM and Kearney were "partners," not "adversaries"; that Kearney was an intended third-party beneficiary of the IBM-FM contract; and that IBM was not merely a vendor in the transaction but also a provider of information and services, and as such had a "special relationship" with FM and with Kearney.
 
 
 19
 Though IBM frequently declared itself FM's and Kearney's "partner," it clearly was not involved in a true partnership agreement with either party.[3] See Karl's, Inc. v. Sunrise Computers, Inc., 901 F.2d 657, 659 (8th Cir.1990) (in action involving contract to purchase retail computer system, no joint venture partnership under Oregon law in the absence of evidence of parties' intent to "(1) jointly share profits, (2) jointly share liability for losses, and (3) jointly share control over the business of the venture"). Nor can it be said that Kearney was an intended third-party beneficiary of the contract between FM and IBM. Of the three categories of third-party beneficiary recognized by Oregon--donee, creditor, and incidental--Kearney is at best an incidental beneficiary, and thus has no enforceable rights under the contract. See Sisters of St. Joseph of Peace, Health, and Hosp. Serv. v. Russell, 318 Or. 370, 867 P.2d 1377, 1380 (1994).
 
 
 20
 Kearney's claims concerning partnership and beneficiary duties are better understood in light of its argument that IBM's relationships with FM and with Kearney are analogous to those described in Onita and progeny as giving rise to an exceptional duty of care. We are asked to determine whether the relationships in question are best characterized as belonging to the commercial adversary or to the special relationship end of the continuum suggested by Onita.
 
 
 21
 Kearney argues that two recent Oregon cases, Lindstrand v. Transamerica Title Ins. Co., 127 Or.App. 693, 874 P.2d 82 (1994), and Meininger v. Henris Roofing & Supply of Klamath County, Inc., 137 Or.App. 451, 905 P.2d 861 (1995), evince the state court's intent to extend the duty to avoid negligent misrepresentation to defendants in positions similar to IBM's vis-a-vis both FM and Kearney.
 
 
 22
 According to Kearney, Lindstrand expands on Onita by holding, in Kearney's words, that "neutral parties who elect to provide information" are subject to a heightened duty of care. We are not persuaded by this argument. In Lindstrand, the Oregon Court of Appeals held that a jury could find that an escrow company which provided deed information extracontractually to residential owners was a "nongratuitous supplier of information," and was bound as such to exercise due care in supplying the information. 874 P.2d at 85. If the jury were to find that the escrow company "supplied the document about the restriction as an adjunct to the performance of its other duties," it would follow as a matter of law that the company "had a duty to exercise due care in providing the restriction." Id.
 
 
 23
 Similarly, in Meininger, the Court of Appeals considered whether "a roof inspector hired by the sellers' agent to inspect a roof in contemplation of the sale of a house has a duty to avoid negligently misrepresenting the condition of the roof." 905 P.2d at 861-62. As a nongratuitous supplier of information, the court held, the roof inspector owes a duty of care to the buyers as intended beneficiaries of the contractual relationship. Id.
 
 The Court of Appeals explained that:
 
 24
 "The common thread in the special relationships that the [Oregon] Supreme Court has recognized as giving rise to a duty of care to protect against purely economic loss is that the professional is acting, at least in part, to further the economic interests of the person to whom the duty is owed."
 
 
 25
 Id. (quoting Ammons v. Jackson County, 119 Or.App. 181, 184, 850 P.2d 376, rev. denied, 318 Or. 24, 862 P.2d 1304 (1993)).
 
 
 26
 In Lindstrand, the relation between the parties was of insurer to insured; in Meininger, the relation was also a fiduciary one--the roof inspector was hired to act in the economic interest of the buyer. There was no arm's length adversarial relationship in either case. Here, by contrast, the relationship of IBM and FM was clearly buyer-seller, as defined by the contract. We do not agree with Kearney that IBM acquired extracontractual obligations to FM based on its statements or assistance in installing the hardware.
 
 
 27
 We hold that neither IBM's friendliness, nor its self-interest, nor its aggressive sales tactics, altered the essentially commercial nature of its relationship with FM. See Uptown Heights Assoc. Ltd. Partnership v. Seafirst Corp., 320 Or. 638, 891 P.2d 639, 645-46 (1995) (holding that a bank's aggressive solicitations to business debtor, assurances that it would work with its client to make project succeed, assertion of "special relationship" with one of the principals, and selfish incentives for entering transaction did not elevate "standard of care on Bank that is higher than that ordinarily applied to debtor-creditor relationships"). We therefore hold that IBM owed no extracontractual duty to FM based on a special relationship; Kearney's derivative claim against IBM accordingly fails.
 
 
 28
 Nor do we agree that Oregon case law supports Kearney's proposition that IBM owed a duty of care to Kearney on this basis. FM was the customer; Kearney was the expert hired to devise a computer system to meet FM's needs. We are unable to infer a source of duty on the part of IBM to look out for Kearney's economic interest under the circumstances.
 
 
 29
 Finally, Kearney urges us to find as a matter of law that "a seller of sophisticated computer equipment assumes a duty of care to provide assistance and support that exists independent of the terms of the contract." Kearney offers no case or statute in support of this claim, but proffered to the district court expert testimony to the effect that computer hardware manufacturers generally, and IBM specifically, provide information, resources and support beyond the norm of the ordinary seller.[4] IBM does not dispute that it provides significant assistance to purchasers of hardware, especially when the purchase is as large as the one in question here. However, IBM would characterize the support it offers as quantitatively, but not qualitatively, different than that provided by a seller of stereophonic or other kinds of technological equipment.
 
 
 30
 Kearney's argument that contracts for computer hardware differ from ordinary sales contracts is contradicted by case law. IBM cites Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 742-43 (2d Cir.1979), holding that a contract for a sale of computer hardware remains a contract for a sale of goods, not services, regardless of any assistance provided by the manufacturer in installing the equipment. Kearney responds that Triangle is inapposite, because it deals with characterization of a contract for statute of limitations purposes, rather than for liability for negligence. In other words, Kearney maintains that the court in Triangle was forced in choosing between statutes of limitations to find that the contract was for either goods or services; it could not have found the contract to be for both. While this argument is questionable--the court in Triangle did not equivocate in deciding the contract was clearly for goods--a recent case of this circuit offers better authority and support for IBM's position.
 
 
 31
 In Apollo Group, Inc. v. Avnet, Inc., we reviewed a computer hardware contract similar to the one between IBM and FM and held the agreement was for sales, not services, in spite of the manufacturer's proffer of technical advice to the buyer. 58 F.3d 477, 480 (9th Cir.1995). Though the dispute involved Arizona law, we looked to federal law for guidance because Arizona courts--like Oregon courts--have yet to formulate a test for determining whether a contract is for sales or services. Id. Under federal law, " '[w]hen a sale predominates, incidental services provided do not alter the basic transaction.' " Id. (quoting RRX Indus., Inc. v. Lab-Con, Inc., 772 F.2d 543, 546 (9th Cir.1985)).
 
 
 32
 Because the "heart of the transaction was the sale of computer hardware," and the computer manufacturer was not paid for its consulting advice, but was remunerated only for the equipment itself, we held the agreement was to be construed as a sales contract. Id.[5] As in Apollo, the agreement between IBM and FM was for the purchase of machines, bore a disclaimer of warranty of fitness for a particular purpose, and contained no consultation provisions. Like the computer vendor in Apollo, IBM was not paid for consulting. Furthermore, FM's president, its CEO, and Kearney's managing director testified that they considered IBM to be a vendor, and not a consultant, either to FM or to Kearney.
 
 
 33
 Because we find no evidence of a special relationship between IBM and either FM or Kearney, and because we decline the invitation in this instance to find computer sales contracts different from other sales contracts as a matter of law, we affirm the district court's decision.
 
 
 34
 AFFIRMED.
 
 
 
 [1]
 Kearney does not appeal the district court's dismissal of its indemnity claim
 
 
 [2]
 Kearney argues, and IBM disputes, that it can pursue a contribution claim seeking purely economic damages under Ore.Rev.Stat. Sec. 18.440(1), which provides:
 Except as otherwise provided in this section, where two or more persons become jointly or severally liable in tort for the same injury to person or property or for the same wrongful death, there is a right of contribution among them even though judgment has not been recovered against all or any of them. There is no right of contribution from a person who is not liable in tort to the claimant.
 The district court did not rule on the question. Because we hold that IBM is not liable in tort to FM, we also decline to reach this issue.
 
 
 [3]
 Kearney's argument that Onita distinguishes between "adversaries" and "partners" is misleading. Onita does not use the word "partners," but, as shown above, distinguishes between commercial adversaries, including "sellers and other presumed antagonists," 843 P.2d at 897 (quotations omitted), and parties with a special relationship or common economic interest
 
 
 [4]
 IBM moved to strike parts of this evidence at the district court level; the court denied the motion as moot, finding that even taking into account the expert testimony, Kearney's evidence was "insufficient to create an issue of fact regarding whether a special relationship existed." IBM's motion to strike covered testimony which offered conclusions concerning legal duty under Oregon law. Expert witnesses may only offer knowledge concerning factual matters. Fed.R.Evid. 702
 
 
 [5]
 The plaintiff in Apollo sought to characterize the transaction as a services agreement to avoid the "economic loss" provision of state law. Unlike Oregon law, which permits plaintiffs suffering pecuniary injury alone to recover in tort where they can demonstrate a "special" or fiduciary relationship with the defendant, Arizona law generally precludes recovery by such plaintiffs. Apollo, 58 F.3d at 480