**NORTH AMERICAN COMMUNICATIONS, INC., Plaintiff,**

v.

**INFOPRINT SOLUTIONS COMPANY, LLC, International Business Machines Corporation, and IBM Credit LLC, Defendants.**

**Civil Action No. 3:08–288.**

United States District Court, W.D. Pennsylvania.

Jan. 13, 2011.

Robert J. Tribeck, Rhoads & Sinon LLP, Harrisburg, PA, for Plaintiff.

Robert N. Feltoon, Conrad O'Brien, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER OF COURT

GIBSON, District Judge.

### I. SYNOPSIS

This matter comes before the Court on a "Motion to Dismiss" (Doc. No. 45), filed by the Defendants, InfoPrint Solutions Company, LLC, ("InfoPrint"), International Business Machines Corporation ("IBM Corporation") and IBM Credit LLC ("IBM Credit") (collectively, "IBM"), (the "Motion to Dismiss"). The Plaintiff, North American Communications, Inc., opposes the Motion to Dismiss. Doc. Nos. 47 & 48. For the reasons that follow, the Motion to Dismiss is **GRANTED.**

### II. BACKGROUND

This case arises out of Plaintiff's lease of two (2) high speed copier machines/printers (the "Machines" or the "Printers") manufactured by Defendant IBM and rented/leased by Plaintiff, and with the related finance and maintenance contracts entered into by Plaintiff and Defendant IBM Credit and Defendant InfoPrint, respectively. Doc. 31–2 at 3. There are 3 written contracts which are at the heart of this dispute:

1) A contract between Plaintiff and Defendant International Business Machines Corporation, entitled "IBM Customer Agreement" (the "Customer Agreement"), dated July 17, 2006 (Doc. 31–2, Exhibit A);

2) A contract between Plaintiff and Defendant IBM Credit, entitled "Term Lease Master Agreement" (the "Finance Agreement"), dated July 17, 2006 (Doc. 31–2, Exhibit B); and

3) An agreement for service of IBM machines/software, comprised of a "Schedule for ServiceElite", a "Master Services Attachment for Servi-

ceElite", and a "Change Authorization for ServiceElite" (the "Service Agreement") (Doc. 31–2, Exhibit C). Each of the subparts of this document is signed by Plaintiff's representative. A signature block also appears for Defendant IBM Corporation, although no signature is present. The parties have acknowledged that IBM Corporation's "business partner", Defendant InfoPrint, was a party to this contract.

Plaintiff claims that the machines failed to function properly at any point after their delivery and installation. Doc. 31–1 at 5. Plaintiff further alleges that Defendants knew the usage intended by Plaintiff, specifically the need to be able to run Magnetic Ink Character Recognition ("MICR") software (Doc. 31–1 at 5), and that the Machines never met their intended usage. Doc. 31–1 at 4. Plaintiff alleges that as a result of Defendants' "material breach" of contract, it has been deprived of the usage and value of the machines. Doc. 31–1 at 4–6. Plaintiff alleges breach of contract against Defendant IBM and Defendant InfoPrint, and breach of warranty against Defendant IBM. Doc. 31–1 at 4–6. Plaintiff requests that this Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201 et seq. Doc. 31–1 at 11. Lastly, Plaintiff seeks rescission of contract and a resulting entitlement to recovery of lease payments to date, consequential and incidental damages, and reasonable attorney's fees. Doc. 31–1 at 12.

## III. JURISDICTION AND VENUE

The Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332. Venue is proper because the Plaintiff has its principal place of business in Duncansville, Blair County, Pennsylvania.

## IV. STANDARD OF REVIEW

### A. Fed.R.Civ.P. 12(b)(6) and Fed. R.Civ.P. 8

Defendant brought this motion pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Doc. 45. Rule 8, which governs general pleading matters, provides that "[a] pleading that states a claim for relief must contain ... (2) a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8. For purposes of Defendant's Motion to Dismiss, the Court looks at whether Plaintiffs "ha[ve] made factual allegations that state a plausible ground for relief" and assumes those allegations to be true. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211–12 (3d Cir. 2009).

The Third Circuit in *Fowler* instructed district courts to conduct a two-part analysis:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

578 F.3d at 210–11 (citations omitted).

As noted in *Ashcroft v. Iqbal*, "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an un-adorned, the defendant-unlawfully-harmed-me accusation, [*internal citations omitted*]. A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of

a cause of action will not do.' [*citations omitted*]. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868, 883 (2009); *quoting and citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 & 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The factual content of a facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. The Court is not required to assume the truth of legal conclusions. *Id.*

As elucidated in *Ashcroft v. Iqbal*,

Two working principles underlie [the Supreme Court's] decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.... Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. [*internal citation omitted*]. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense, [*internal citations omitted*]. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of mis-

conduct, the complaint is alleged-but it has not 'show[n]' 'that the pleader is entitled to relief.' ... [Further, w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868, 883 (2009); *citing Twombly*, at 555–56, 127 S.Ct. 1955; *also citing* Fed. R. Civ. Proc. 8(a)(2); *also citing* 490 F.3d 143, 157–58 (2d Cir.2007).

## B. Choice of Law

■ In federal diversity cases, a federal court must apply the conflict of law rules of the forum state in which it sits, in this case, Pennsylvania.[1] *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (U.S.1941); *cited by Garcia v. Plaza Oldsmobile Ltd.*, 421 F.3d 216, 219 (3d Cir.2005); *also cited by Britton v. Whittmanhart, Inc., et al.*, 2009 U.S. Dist. LEXIS 71813, *8; *see also GNC Franchising, Inc. v. Tim O'Brien et al.*, 443 F.Supp.2d 737, 743 (W.D.Pa.2006).

■ As the Third Circuit has noted, Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them if that state bears a reasonable relationship to the contract. *Kruzits v. Okuma Machine Tool, Inc., et al.*, 40 F.3d 52, 55 (3d Cir.1994); *see also Heunisch v. Exidyne, Inc., et al.*, 1985 U.S. Dist. LEXIS 14960, *4 (W.D.Pa.1985);

---

1. We have, however, noted a narrow exception in cases where the Federal Arbitration Act is applicable; in these cases, even where jurisdiction is based on diversity, federal law would apply in construing and enforcing *arbitration* clauses. *See Heunisch v. Exidyne,*

*Inc., et al.*, 1985 U.S. Dist. LEXIS 14960, *4 (W.D.Pa.1985); *citing Southland Corp. v. Keating*, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984); *also citing* 9 U.S.C. § 2. There is no indication that the Federal Arbitration Act would apply in the case before us.

*see also Hopkins v. GNC Franchising, Inc.*, 2006 WL 2266253, \*3, 2006 U.S. Dist. LEXIS 59438, \*9 (W.D.Pa.2006); see also *Bishop et al. v. GNC Franchising, LLC, et al.*, 403 F.Supp.2d 411, 415 (W.D.Pa.2005).

Further, Pennsylvania courts have adopted section 187 of the Restatement, Second, Conflict of Laws, which provides as follows:

> (1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

> (2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is · one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

>> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

>> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

> (3) In the absence of a contrary indication of intention, the reference is to the local law of the state of the chosen law.

Restatement 2d of Conflict of Laws, § 187; *cited* by *Kruzits* at 55.

Thus, this Court has held that in accordance with Pennsylvania's adoption of the Restatement (Second) Conflict of Laws, § 187, contract provisions should be upheld as long as the transaction bears a " 'reasonable relationship to the state whose law is governing.' " *GNC Franchising, Inc. v. Tim O'Brien, et al.* at 743; *quoting Churchill Corp. v. Third Century, Inc.*, 396 Pa.Super. 314, 578 A.2d 532, 537 (Pa.Super.1990); *see also Hopkins v. GNC Franchising, Inc.*, 2006 WL 2266253, \*3–4, 2006 U.S. Dist. LEXIS 59438, \*10 (W.D.Pa.2006).[2] Further, "Pennsylvania courts will only ignore a contractual choice of law provision if that provision conflicts with strong public policy interests." *Kruzits* at 56; *citing Soxman v. Goodge*, 372 Pa.Super. 343, 539 A.2d 826 (Pa.Super, 1988); *see also Leidy v. Deseret Enterprises, Inc.*, 252 Pa.Super. 162, 381 A.2d 164 (Pa.Super.1977).

Where two states have an interest generally in the protection of their citizens from illegal activities, for example, fraud, this is generally an insufficient basis to justify non-application of a contract's choice of law provision where there is some reasonable relationship between the choice of law clause and the contractually chosen state. *See, e.g., Alnoor Rahemtulla et al. v. Nazim Hassam et al.*, 539 F.Supp.2d 755, 763–64 (M.D.Pa.2008); *see also Hopkins v. GNC Franchising*, 2006 WL 2266253, \*3–4, 2006 U.S. Dist. LEXIS 59438, \*10 (W.D.Pa.2006).

## V. DISCUSSION

Defendants argue for dismissal on several grounds: 1) that Plaintiff's claim is time-barred under the Statute of Limitations; 2) that Plaintiff has not stated a claim as to Defendant InfoPrint upon

---

**2.** "Pennsylvania courts have traditionally held that a choice of law provision in a contract will be upheld as long as the transaction bears a 'reasonable relationship to the state whose law is governing.' "

which relief may be granted; 3) that the contract with Defendant IBM Credit through which the Machines were financed is independent of the two other contracts formed between Plaintiff and Defendants IBM Corporation and InfoPrint and that it contains a "hell or high water" clause requiring Plaintiff to make its finance payments regardless of Plaintiff's satisfaction with the two other contracts, to which Defendant IBM Credit is not a party; and 4) that the complaint is inadequate under the notice requirements of Fed. Civ. Pro. R. 8(a) because it fails to mention a third party which actually bought the Machines from Defendant IBM Corporation and with which Plaintiff dealt directly and exclusively in purchasing the Machines. Doc. 48 at 5–6.

## A. Choice of Law

■ Defendants argue that this Court should apply the choice of law provisions in the contracts which is New York law. Doc. 46 p. 23. In contrast. Plaintiff argues that that Pennsylvania law should apply. Plaintiff argues that the Commonwealth of Pennsylvania has a stronger interest in this dispute, the "transaction does not bear a 'reasonable relationship'" to New York, and New York has no substantial relationship to the parties or the transaction,[3] therefore Pennsylvania law should be applied. Doc. 48 at 15.

Defendants argue that Defendant IBM is headquartered in New York and does business in New York, and either of these facts alone would be sufficient to demonstrate a reasonable relationship with the State of New York and thus require that the Court honor the parties' contractual choice of law clause and apply New York substantive law,[4] Doc. 46 at 23.

The Customer Agreement between the parties specifies the laws of the State of New York as governing the contract and all disputes arising thereunder:

Geographic Scope and Governing Law.

The rights, duties, and obligations of each of us are valid only in the United States except that all licenses are valid as specifically granted.

Both you and IBM consent to the application of the laws of the State of New York to govern, interpret and enforce all of your and IBM's rights, duties, and obligations arising from, or relating in any manner to, the subject matter of this Agreement, without regard to conflict of law principles.

In the event that any provision of this Agreement is held to be invalid or unenforceable, the remaining provisions of this

Agreement remain in full force and effect. Nothing in this Agreement affects any statutory rights of consumers that cannot be waived or limited by contract.

---

**3.** Plaintiff argues that it is a corporation with its principal place of business in Pennsylvania, some pre-contract communications and testing occurred in Pennsylvania, the lease/purchase of the Printers occurred in Pennsylvania, the Printers were installed in Plaintiffs Duncansville, Pennsylvania facility, repairs and maintenance services were performed in Pennsylvania, breaches occurred in Pennsylvania, and the harm was suffered in Pennsylvania. In contrast, Plaintiff argues, the only connection to New York is that Defendant IBM has its principal place of business in New York. Doc. 48 at 16.

**4.** This dispute has significance because New York law does not recognize the "repair doctrine", while Pennsylvania law does, see discussion, *infra; see also* Doc. 48 at 17; Doc. 46 at 23. The "repair doctrine" is a common-law equitable estoppel of the statute of limitations for breach of warranty where the seller attempts to make repairs and represents that such repairs will cure the defect. *Momentive Performance Materials*, 659 F.Supp.2d 332, 348.

We will apply the contractually-chosen law of the State of New York.

As stated above, Pennsylvania courts will only ignore a contractual choice of law provision if that provision conflicts with strong public policy interests. The Third Circuit's decision in *Kruzits v. Okuma Machine Tool, Inc.* is directly on point:

> In the commercial world, where a ... company [incorporated in a state other than Pennsylvania] finances purchases of commodities, machinery and equipment in many, if not all, of the states in the nation, it is understandable and reasonable that [such a company would] include choice of law provisions in its financial agreements to ensure that those agreements are governed by the law of its principal place of business rather than each and every state where its borrowers do business. We hold that under Pennsylvania choice of law rules, contractual choice of law provisions contained in a financial agreement that enables an employer to purchase plant equipment is binding on the parties.

*Kruzits* at 56. The *Kruzits* court rejected an argument that the choice of law provision impacted Pennsylvania's public policy as codified in the Pennsylvania Worker's Compensation Act ("PWCA"), finding that any tangential relationship to this Act did not infringe upon the PWCA or any Pennsylvania public policy interest. *Id.* Similarly, we find that there is no impact in this case to a strong public policy of the Commonwealth of Pennsylvania. Further, the general interest of Pennsylvania in discouraging breaches of contracts or breaches of warranties which might impact its citizens is too general an interest to justify non-application of the parties' agreed-upon choice of law.

As we previously held in *Hopkins v. GNC Franchising, Inc.*, Plaintiff in this case has not argued that application of New York law would be contrary to some fundamental policy of Pennsylvania. 2006 WL 2266253, *, 2006 U.S. Dist. 59438, *10 (W.D.Pa.2006). Rather, it is reasonable for a company (Defendant IBM) based in New York, that does business on a nation-wide basis, to want uniformity of interpretation of its contracts, and therefore to stipulate New York law as governing its contracts. *See Id.*

Thus, we hold that the parties' choice of law, as expressed in their contractual agreements, is not superseded. Defendants are correct that the fact that Defendant IBM is headquartered in New York and does business in the State of New York establishes a reasonable relationship to the contract such that the choice of New York law specified in the contract will be upheld. Accordingly, we apply New York State law in this analysis.

### B. Statute of Limitations and Warranties

#### i. Arguments presented

Defendant argues that the statute of limitations had already run at the time Plaintiff filed the instant action on December 17, 2008. Doc. 46 at 8–9. Plaintiff responds that the statute of limitations did not begin running at the time of installation in July or August 2006, because the statute of limitations was tolled by the fact that Defendant InfoPrint continued to advise Plaintiff, from the time of installation until January or February 2007, that the printers were functional and would perform according to Plaintiff's needs and specifications, but simply had temporary and fixable glitches related to installation. Doc. 48 at 6–7. Plaintiff claims that it was not until some point in January or February 2007 that Defendant InfoPrint first advised Plaintiff that "the Printers themselves were defective and were incapable of properly running MICR technology, at the appropriate levels to achieve the yield

output and quality required."[5] Doc. 48 at 7. Therefore, Plaintiff argues that the statute of limitations did not begin to run until January or February of 2007, and thus Plaintiff's complaint was timely. Doc. 48 at 9.

Plaintiff acknowledges that the Customer Agreement limits the statute of limitations to two years, rather than the four years stipulated in New York's Uniform Commercial Code, discussed supra. However, Plaintiff argues that the agreement as a whole included monthly service payments (under the Service Agreement) and monthly finance payments (under the Credit Contract), therefore the warranty by Defendants extended to future performance; thus, the cause of action accrued when the breach *was* or *should have been* discovered, see supra, which was sometime in January or February of 2007. Doc. 48 at 9–10. Further, Plaintiff argues that the seven (7) year term of the Service Agreement warranty extends the warranty on the Machines themselves, making this action timely. Doc. 48 at 10, 12.

Defendants argue that the warranty provision in the Customer Agreement extends to the condition of each machine at the time of delivery and for repair or replacement up to two years from the time of delivery, but does not provide a warranty for future performance, as claimed by Plaintiff, that might toll the statute of limitations. Doc. 46 at 25.

Defendants also argue that when interpreted under New York law (see discussion, *supra*), the warranty provided in the Customer Agreement is a "repair or replace warranty", rather than a warranty for future performance. Doc. 46 at 25. Defendants argue that this means that the only option available to Plaintiff under the contract was to have the Machines either repaired or replaced within the time allotted under the contractually-specified two year statute of limitations. *Id.*

### ii. Legal Precedent

■ Under New York law, "[t]he applicable statute of limitations for a breach of warranty, express or implied, on a contract of sale for a good is four years, [*internal citations omitted*]. Under New York law, a cause of action for breach of warranty begins to accrue upon the date of delivery." *Gary Woods et al. v. Maytag Co. et al.*, 2010 WL 4314313, *2, 2010 U.S. Dist. LEXIS 116595, *6 (E.D.N.Y.2010); *citing* N.Y. U.C.C. 2–725; *also citing Fernandez v. Cent–Mine Equip. Co.*, 670 F.Supp.2d 178, 189 (E.D.N.Y.2009); *see also Momentive Performance Materials USA, Inc.*, 659 F.Supp.2d 332, 338 (N.D.N.Y.2009). However, parties may expressly specify a shorter warranty in the terms of the contract. *See H. Sand & Co., Inc. v. Airtempt Corporation*, 934 F.2d 450, 453 (2nd Cir.1991).

There are two exceptions to the four year statute of limitations outlined above: the first exception is where a warranty explicitly guarantees future performance; second, in cases of fraudulent concealment courts have applied equitable estoppel to toll the statute of limitations if the fraud prevented the plaintiff from filing a timely action. *Gary Woods et al. v. Maytag Co. et al.*, 2010 WL 4314313, *2–3, 2010 U.S. Dist. LEXIS 116595, *6 (E.D.N.Y.2010).

#### a. Guarantees of future performance

■ The future performance exception to the statute of limitations on the sale of goods applies only to *express* warranties, not implied warranties, and the express warranty must explicitly extend to future performance. *Gary Woods et al. v. May-*

---

**5.** Plaintiff alleges that until that point Defendant InfoPrint had represented that performance issues could be remedied, at one point, for instance, identifying the problem as requiring only a replacement of toner cartridges. Doc. 48 at 13.

*tag Co. et al.,* 2010 WL 4314313, *3, 2010 U.S. Dist. LEXIS 116595, *7–8 (E.D.N.Y. 2010); *see also Rosen v. Spanierman,* 894 F.2d 28, 31 (2d Cir.N.Y.1990); *see also* U.C.C. § 2–725; *see also Brainard v. Freightliner Corporation,* 2002 WL 31207467, *2–3, 2002 U.S. Dist. LEXIS 18617, *9–11 (W.D.N.Y.2002).

The future performance exception is a narrow exception and must be clearly stated in the language of the contract:

'[T]he term 'explicit' has been explained as plain language which is distinctly stated, clear and unequivocal to the point that there is no doubt as to its meaning.' ... '[W]arranties to repair or replace the product in the event that it fails to perform, without any promise of performance, do not constitute warranties of future performance.'

█ *Gary Woods et al. v. Maytag Co. et al.,* 2010 WL 4314313, *3, 2010 U.S. Dist. LEXIS 116595, *8 (E.D.N.Y.2010); *citing and quoting Port Auth. of N.Y. & N.J. v. Allied Corp.,* 914 F.Supp. 960, 962 (S.D.N.Y.1995); *also citing and quoting Rochester–Genesee Reg'l Trans. Auth. v. Cummins Inc.,* No. 09–CV–6370, 2010 U.S. Dist. LEXIS 75805, 2010 WL 2998768, at *3–4 (W.D.N.Y.2010); *see also Momentive Performance Materials USA, Inc. v. AstroCosmos Metallurgical, Inc.,* 659 F.Supp.2d 332, 347 (N.D.N.Y.2009); *see also Brainard v. Freightliner Corporation,* 2002 WL 31207467, *3, 2002 U.S. Dist. LEXIS 18617, *12–13 (W.D.N.Y.2002). Thus, warranties to repair or replace a good are distinct from warranties for future performance, and do *not* extend the statute of limitations.

█ When a warranty *explicitly* guarantees future performance the cause of action accrues when the breach *is or ought*

to have been discovered. *Gary Woods et al. v. Maytag Co. et al.,* 2010 WL 4314313, *3, 2010 U.S. Dist. LEXIS 116595, *7 (E.D.N.Y.2010); *citing* N.Y. U.C.C. 2–725(2). In contrast, an *implied* warranty cause of action accrues *at the time of delivery, see supra; see also Gary Woods et al. v. Maytag Co. et al.,* 2010 WL 4314313, *3, 2010 U.S. Dist. LEXIS 116595, *7 (E.D.N.Y.2010); *citing Orlando v. Novurania of America, Inc.,* 162 F.Supp.2d 220, 224 (S.D.N.Y.2001); *see also Momentive Performance Materials USA, Inc. v. AstroCosmos Metallurgical, Inc.,* 659 F.Supp.2d 332, 347–48 (N.D.N.Y. 2009); *see also* U.C.C. § 2–725.

█ Even when a warranty explicitly extends to future performance, an immediate failure of the goods takes the case out of that exception. *See, e.g., Momentive Performance Materials v. AstroCosmos Metallurgical, Inc., et al.,* 659 F.Supp.2d 332, 348 (N.D.N.Y.2009).[6]

**b. Fraudulent Concealment**

█ In order for the fraudulent concealment exception to the statute of limitations to apply, there must be; 1) a duty on the part of the defendant to disclose material information; 2) a material false representation by the defendant; 3) an intent on the part of the defendant to defraud the plaintiff thereby; 4) a reasonable reliance by the plaintiff on the materially false representation; and 5) damage to the plaintiff as a result of this reliance, *Gary Woods et al. v. Maytag Co. et al.,* 2010 WL 4314313, *5, 2010 U.S. Dist. LEXIS 116595, *13 (E.D.N.Y.2010); *citing Wall v. CSX Transp., Inc.,* 471 F.3d 410, 415–16 (2d Cir.2006); *also citing Manhattan Mo-*

---

**6.** "[I]f a 'breach [is] discovered almost immediately upon delivery of the machine ... the statute of limitations, even with regard to 'future performance,' [would begin] to run

[from the time of that initial breach].' " 659 F.Supp.2d 332, 348 (N.D.N.Y.2009); *quoting Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F.2d 737, 743 (2d Cir.1979).

torcars, Inc. v. Automobili Lamborghini S.p.A., 244 F.R.D. 204, 213 (S.D.N.Y.2007).

Plaintiff has not claimed fraudulent concealment.[7] As such, we will not analyze whether or not this exception would toll the statute of limitations in the instant case.

### c. Repair Doctrine

█ It is important to note that under New York law, a plaintiff's reliance upon promises to repair a product does *not* toll the statute of limitations. *Momentive Performance Materials USA, Inc. v. Astro-Cosmos Metallurgical, Inc.*, 659 F.Supp.2d 332, 338–39, 348 (N.D.N.Y.2009); *citing Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir.1979); *in turn citing Thalrose v. General Motors*, 8 U.C.C. Rep.Serv. 1257, *Aff'd without opinion*, 41 A.D.2d 906, 343 N.Y.S.2d 303 (1st Dept.1973); *see also H. Sand & Co., Inc. v. Airtemp Corporation*, 934 F.2d 450, 455 (2nd Cir.1991) (the tender of delivery of a defective machine is deemed to have occurred when the machine was first delivered, not when the repair attempts were finally abandoned). The "repair doctrine" is a common-law equitable estoppel of the statute of limitations for breach of warranty where the seller attempts to make repairs and represents that such repairs will cure the defect. *Momentive Performance Materials*, 659 F.Supp.2d 332, 348. The majority of jurisdictions, including New York, have declined to apply this doctrine/exception. *Id.* at 348–349; *citing Zielinski v. Alfa–Laval, Inc.*, No. CIV–86–296E, 1989 WL 29482, *2 (W.D.N.Y.1989); *see also Triangle Underwriters, Inc. v. Honeywell, Inc.*, 604 F.2d 737, 743 (2d Cir.1979) ("New York law provides generally that a manufacturer's efforts at repair subsequent to delivery do not extend the contract statute of limitations."); *see also Koenig Iron Works, Inc. v. Sterling Facto-*

ries, Inc., 1999 WL 178785, 1999 U.S. Dist. LEXIS 3973 (S.D.N.Y. Mar. 30, 1999).

As neatly stated in *Momentive Performance Materials*, "[s]ince this claim arises under New York's Uniform Commercial Code, a four-year statute of limitations applies. Unless the warranty explicitly extends to future performance, a breach of warranty claim accrues at the time of delivery." 659 F.Supp.2d 332, 348 (N.D.N.Y. 2009).

█ In the instant case, the warranty in the Customer Agreement does not extend to future performance. The Customer Agreement between Plaintiff and Defendant IBM Corporation has a warranty clause which provides, in relevant part:

IBM warrants that each IBM Machine is free from defects in materials and workmanship and conforms to its Specifications.

The warranty period for a Machine is a specified, fixed period commencing on its Date of Installation. During the warranty period, IBM provides repair and exchange Service for the Machine, without charge, under the type of Service IBM designates for the Machine. If a Machine does not function as warranted during the warranty period and IBM is unable to either 1) make it do so or 2) replace it with one that is at least functionally equivalent, you may return it to IBM and your money will be refunded.

Additional terms regarding Service for Machines during and after the warranty period are contained in Part 5.

. . .

**Extent of Warranty.**

If a Machine is subject to federal or state consumer warranty laws, IBM's statement of limited warranty included

---

**7.** In order to allege fraud the Plaintiff must "state with particularity the circumstances constituting fraud." USCS Fed. Rules Civ. Proc. R. 9.

with the Machine applies in place of these Machine warranties.

. . .

THESE WARRANTIES ARE YOUR EXCLUSIVE WARRANTIES AND REPLACE ALL OTHER WARRANTIES OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OR CONDITIONS OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

. . .

Part 5 goes on to state, in relevant part:

Part 5—Services

5.3 Service for Machines (during and after warranty)

IBM provides certain types of Service to keep Machines in, or restore them to, conformance with their Specifications. IBM will inform you of the available types of Service for a Machine. At its discretion, IBM will 1) either repair or exchange the failing Machine and 2) provide the Service either at your location or a service center.

The above-quoted clauses of the Customer Agreement are very clearly and thoroughly limited in their scope. The warranty as to the Machines is a two year warranty to repair or replace. The Machines were delivered "on or about July or August 2006." Doc. No. 31–2 at 8. This suit was filed on December 17, 2008. Thus, the statute of limitations had run.

Further, in the instant case, the plaintiff claims that the Machines never functioned properly from the first date of installation. Therefore, even if the warranty *did* explicitly apply to future performance, which it does not, the exception to the four-year statute of limitations (as further limited by the contract to two years) under New York's Uniform Commercial Code does not apply because there was immediate failure of the goods, see supra.

## C. Pleading Specificity as to Defendant InfoPrint

Defendants argue that Plaintiff's complaint is insufficient as to InfoPrint because Plaintiff does not point to a specific term within the services agreement that Defendant InfoPrint is alleged to have breached, and that Plaintiff has also failed to allege "any actions by InfoPrint that would constitute a breach" of the Services Agreement. Doc. 46 at 9, 26–27. Defendants argue that the complaint is therefore insufficient under Fed.R.Civ.P.R. 8(a).

Defendants argue that Defendant InfoPrint was responsible only for providing maintenance and servicing of the Machines under the contract, and that Plaintiff has not alleged that Defendant InfoPrint failed to perform this duty, therefore there was no breach of contract on the part of Defendant InfoPrint. Doc. 46 at 27. Further, Defendants argue that Defendant InfoPrint is not liable if the Machines failed to perform their specified function because Defendant InfoPrint did not provide a warranty of the Machines, Doc. 46 at 28. Lastly, Defendants argue that if any warranty on the part of Defendant InfoPrint were found to exist, it would be barred under the Statute of Limitations, as discussed above. Doc. 46 at 28.

Plaintiff responds that its complaint satisfies the requirements of the Federal Rules of Civil Procedure Rule 8(a) in that it alleges that Defendant InfoPrint had signed a contract to provide maintenance, supplies, and repair services for the Printers to Plaintiff, that Defendant InfoPrint had a duty to Plaintiff "to 'keep machines in, or restore them to, conformance with their Specifications' ", that Defendant InfoPrint did not perform this obligation, and that as a result Plaintiff suffered harm. Doc. 48 at 18.

While the contractual term for the Service Agreement is seven years, the text of

the Service Agreement covers only service, not the Machines themselves. Further, the Customer Agreement, quoted *supra,* specifically states that the warranties for machines expressed therein are complete and total in scope, and supersede any external writings or understandings. Plaintiff states that the Machines manufactured by IBM Corporation are defective. Doc. No. 31–2 at 8, para. 45. At the same time, Plaintiff states that Defendant InfoPrint has materially breached its agreement "to provide maintenance, supplies, and repair services." Doc. No. 31–2 at 8, para. 48. Plaintiff is conflating the failure of the Machines, which it admits was caused by a defect in the Machines, with a failure of service. Plaintiff freely admits in the complaint that Defendant InfoPrint made numerous attempts to fix the machines and provided repair services as specified under the Services Contract, and further does not argue that Defendant InfoPrint's methods or personnel were insufficient or incompetent, but rather that the Machines were "defective." Doc. 31–2 at 4–8.

Thus, the Plaintiff has pled no basis for relief as to Defendant InfoPrint.

### D. Enforceability of the contract between Plaintiff and Defendant IBM Credit

#### i. Arguments presented

Defendants argue that Plaintiff "alleges no misdeed or omission by [Defendant] IBM Credit", that Defendant IBM Credit is not responsible for any alleged breach under the lease, and that Defendant IBM Credit owed no duty to Plaintiff in terms of the functioning of the Machines. Doc. 46 at 28–29.

Defendants rely heavily on the "hell or high water" doctrine, which they argue is applicable under New York law. Under this doctrine, any claims against IBM Credit are barred by a clause in the Finance Agreement, which provides that Plaintiff's

> obligation to pay all Rent and other amounts required to be paid by [the Plaintiff] under this Agreement is absolute and unconditional and shall not be affected by any right of set-off or defense of any kind whatsoever, including any failure of the Equipment or a Financed Item to perform, or any representations by Lessee's Supplier. Lessee shall make any claim solely against Lessee's Supplier, the Equipment manufacturer or other third party if the Equipment or a Financed Item is unsatisfactory for any reason.

Doc. No. 31–2 at 26; Doc. No. 46 at 9. Defendants argue that "[t]he governing law is crystal clear that such provisions are to be upheld and enforced"—thus, Plaintiff's obligation to make financing payments to IBM Credit is unaffected by the failure of the printers. *Id.* At 9, 29. Defendants state that this "hell or high water" clause, valid under New York law, requires the lessee (Plaintiff) to make all payments due under the lease regardless of the functioning of the equipment that is the subject of the lease. Doc. 46 at 30.

Plaintiff's response to this argument is that the complaint has set forth two valid claims against IBM Credit: firstly, that the lease agreement between Plaintiff and Defendant IBM Credit should be terminated by virtue of the entry of declaratory judgment and subsequent return of the Printers to Defendant IBM, which would also release Plaintiff from making further monthly payments under the lease agreement; and secondly, that this Court should grant the equitable remedy of rescission of the Lease Agreement between Plaintiff and Defendant IBM Credit, due to breaches and misrepresentations by Defendants InfoPrint and IBM, the latter being the parent company of wholly-owned subsidiary IBM Credit. Doc. 48 at 5, 19–20. We

note at the outset that these suggestions are simply requests for action by the Court, not defenses or legal exceptions to the "hell or high water" doctrine. Plaintiff further argues that the cases cited by Defendants are inapplicable in the instant case because they deal with instances where a lessee has defaulted under the obligations of its lease agreement, and that in contrast it has been making timely payments and has not defaulted. Doc. 48 at 20.

### ii. Legal Precedent

Federal district courts in New York have honored "hell or high water" clauses in equipment finance leases:

> When a lessee under a finance lease promises to make payments to the lessor regardless of the quality of the equipment being leased, the lessor is not responsible for the quality of the product, [*internal citations omitted*]. The purpose of such a lease is to protect the lessor, who acts as a financier and who is removed from 'the selection, manufac-

ture and supply of the goods,' from being held responsible for the quality of the equipment at issue, [*internal citations omitted*]. The Second Circuit has held that a so-called 'hell or high water' clause in a finance lease, which makes the lessee's obligation to pay unconditional, is valid.

*Citicorp Leasing, Inc. v. Kusher Family Limited Partnership, et al.,* 2006 WL 1982757, *4, 2006 U.S. Dist. LEXIS 50682, *11 (S.D.N.Y.2006); *see also Wells Fargo Bank, N.A. v. BrooksAmerica Mortgage Corporation and Michael Wayne Brooks,* 419 F.3d 107, 110 (2005) ("In the context of a finance lease containing a hell or high water clause, the lessee must make payments regardless of defective performance on the part of the lessor, that is, 'come hell or high water.' ... Nonperformance by the lessor is irrelevant, at least when the lessee was a sophisticated party.").

 The contract between Plaintiff and Defendant IBM Credit qualifies as a finance lease.[8] However, even where a

---

**8.** A finance lease is defined under the Uniform Commercial Code as follows:

"(g) "Finance lease" means a lease with respect to which:

(i) the lessor does not select, manufacture, or supply the goods;

(ii) the lessor acquires the goods or the right to possession and use of the goods in connection with the lease; and

(iii) one of the following occurs:

(A) the lessee receives a copy of the contract by which the lessor acquired the goods or the right to possession and use of the goods before signing the lease contract;

(B) the lessee's approval of the contract by which the lessor acquired the goods or the right to possession and use of the goods is a condition to effectiveness of the lease contract;

(C) the lessee, before signing the lease contract, receives an accurate and complete statement designating the promises and warranties, and any disclaimers of warranties, limitations or modifications of remedies, or liquidated damages, includ-

ing those of a third party, such as the manufacturer of the goods, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods; or

(D) if the lease is not a consumer lease, the lessor, before the lessee signs the lease contract, informs the lessee in writing (a) of the identity of the person supplying the goods to the lessor, unless the lessee has selected that person and directed the lessor to acquire the goods or the right to possession and use of the goods from that person, (b) that the lessee is entitled under this Article to the promises and warranties, including those of any third party, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods, and (c) that the lessee may communicate with the person supplying the goods to the lessor and receive an accurate and complete

lease does not qualify as a finance lease under the U.C.C., parties to a contract may exclude or modify implied warranties by conspicuous and express/specific language in the contract. *Citicorp Leasing, Inc.*, 2006 WL 1982757 at *5, 2006 U.S. Dist. LEXIS 50682 at *13; *citing Maltz v. Union Carbide Chem. & Plastics Co.*, 992 F.Supp. 286, 304 (S.D.N.Y.1998).

In addition, federal district and state courts in New York have held that corporate veils will not be pierced to justify invalidating a "hell or high water" clause. *See e.g., Canon Financial Services, Inc. v. Medico Stationery Service, Inc., et al.*, 300 A.D.2d 66, 751 N.Y.S.2d 194 (1st Dept. 2002) (even where a joint venture exists between the party providing financing and the party providing equipment under an equipment lease transaction, or where they are subsidiaries of the same parent company, this does not invalidate a "hell or high water" clause in a finance contract, and the lessee is still required to make payments under such a scenario); *see also Citicorp Leasing, Inc., supra*, 2006 WL 1982757 at *6, 2006 U.S. Dist. LEXIS 50682 at *17.

 Thus, even if IBM Credit is related to or a wholly-owned subsidiary of Defendant IBM Corporation, this is of no import: the "hell or high water" clause is not invalidated by this corporate relationship, and Plaintiff must continue to honor the terms of its contract with Defendant IBM Credit: The explicit "hell or high water" clause agreed to by the Plaintiff and Defendant IBM Credit must be honored under New York law. Therefore, Plaintiff's instant claims against Defendant IBM Credit for breach of contract and warranty must be dismissed with prejudice.

statement of those promises and warranties, including any disclaimers and limitations of them or of remedies."
U.C.C. § 2A–103.

**E. Argument that the complaint is insufficient because it fails to name the alleged third party supplier to Defendant IBM, Sirius**

Defendants argue that complaint fails to adequately state a claim because the Printers which are allegedly defective a nonparty to the case, were supplied to the Plaintiff by Sirius Enterprise Systems Group, LLC ("Sirius"), which is not named in the complaint. Doc. 46 at 9–10. We will not address this issue, as the Complaint fails for other reasons, discussed *supra*.

## VI. CONCLUSION

For the reasons stated above, the Motion to Dismiss (Doc. 45) is **GRANTED** with prejudice as to Defendants IBM Credit and InfoPrint, and without prejudice as to Defendant IBM Corporation, with leave to refile against the latter within ten (10) days *if* Plaintiff believes in good faith that there is a valid basis for a claim of fraudulent concealment.[9] An appropriate order follows.

### *ORDER*

**AND NOW**, this 13th day of January, 2011, this matter coming before the Court on Defendant's Motion to Dismiss (Doc. 45), **IT IS HEREBY ORDERED** that the Defendant's Motion is **GRANTED** with prejudice as to Defendants IBM Credit and InfoPrint, and is **GRANTED** without prejudice as to Defendant IBM Corporation, with leave to refile against the latter within ten (10) days *if* Plaintiff believes in good faith that there is a valid basis for a claim of fraudulent concealment.

9. The Court notes that Plaintiff has provided nothing in the filings to date which would suggest such a theory or basis therefore.

## MEMORANDUM AND ORDER OF COURT

### I. SYNOPSIS

This matter comes before the Court on Plaintiff's Motion for Reconsideration (the "Motion for Reconsideration") (Doc. No. 60) of this Court's dismissal, with prejudice, of the claims against Defendant InfoPrint Solutions Company, LLC ("InfoPrint") (*See* Doc. No. 58). Former Defendant InfoPrint opposes the Motion for Reconsideration (the "Motion for Reconsideration"). Doc. No. 69. For the reasons that follow, the Motion for Reconsideration is **DENIED**.

### II. BACKGROUND

This case arises out of Plaintiff's lease of two (2) high speed copier machines/printers (the "Machines" or the "Printers"), manufactured by Defendant IBM and rented/leased by Plaintiff, and with the related finance and maintenance contracts entered into by Plaintiff and former Defendants IBM Credit and InfoPrint, respectively. Doc. 31–2 at 3. There are 3 written contracts which are at the heart of this dispute:

1) A contract between Plaintiff and Defendant International Business Machines Corporation, entitled "IBM Customer Agreement" (the "Customer Agreement"), dated July 17, 2006 (Doc. 31–2, Exhibit A);

2) A contract between Plaintiff and Defendant IBM Credit, entitled "Term Lease Master Agreement" (the "Finance Agreement"), dated July 17, 2006 (Doc. 31–2, Exhibit B); and

3) An agreement for service of IBM machines/software, comprised of a "Schedule for ServiceElite", a "Master Services Attachment for ServiceElite", and a "Change Authoriza-

tion for ServiceElite" (the "Service Agreement") (Doc. 31–2, Exhibit C). Each of the subparts of this document is signed by Plaintiff's representative. A signature block also appears for Defendant IBM Corporation, although no signature is present. The parties have acknowledged that IBM Corporation's "business partner", Defendant InfoPrint, was a party to this contract.

Plaintiff's Second Amended Complaint ("SAC") alleged that the Machines failed to function properly at any point after their delivery and installation. Doc. 31–1 at 5. Plaintiff further alleged in the SAC that Defendants knew the usage intended by Plaintiff, specifically the need to be able to run Magnetic Ink Character Recognition ("MICR") software (Doc. 31–1 at 5), and that the Machines never met their intended usage. Doc. 31–1 at 4. In the SAC, Plaintiff alleged breach of contract by Defendants IBM and InfoPrint, and breach of warranty by Defendant IBM. Doc. 31–1 at 4–6. Plaintiff also requested that this Court enter a declaratory judgment pursuant to 28 U.S.C. § 2201 et. seq. Doc. 31–1 at 11. Lastly, Plaintiff sought rescission of contract and a resulting entitlement to recovery of lease payments to date, consequential and incidental damages, and reasonable attorney's fees. Doc. 31–1 at 12.

On January 13, 2011, this Court entered a "Memorandum and Order of Court" (Doc. No. 58) which granted Defendants' Motion to Dismiss: the Defendants' Motion was granted with prejudice as to Defendants IBM Credit and InfoPrint, and granted without prejudice as to Defendant IBM Corporation, with leave for Plaintiff to re-file against the latter within ten (10) days *if* Plaintiff believed in good faith that there was a valid basis for a claim of fraudulent concealment.[1]

---

1. If there was such a basis to plead fraudulent concealment, and the charge was adequately

stated in the complaint, this would allow the complaint to survive dismissal based on the

On January 21, 2011 Plaintiff filed with this Court the instant Motion for Reconsideration (Doc. No. 60) of this Court's dismissal (Doc. No. 58) of all counts against Defendant InfoPrint. Also on January 21, 2011, the Plaintiff filed its Third Amended Complaint ("TAC") (Doc. No. 59), in which the Plaintiff attempts to establish the basic elements of a fraudulent concealment charge against Defendant IBM, as Plaintiff was given leave to do by this Court's Order of January 13, 2011.[2] The TAC also reasserts Counts II and IV of the SAC against InfoPrint, which are for breach of contract and a request for declaratory judgment, respectively. Doc. No. 59. Plaintiff requests leave to do so in its Motion for Reconsideration, arguing that new facts, which were not previously available, have come to light since this Court's Order of January 13, 2011, and reconsideration is necessary to prevent a manifest injustice. Doc. 60 at 2. The "new facts" on which Plaintiff relies consist of several emails in early October, 2007, sent internally between IBM executives and also between InfoPrint and IBM executives, discussing the problems with the printers, and indicating that other customers were having similar problems with this model printer. Doc. Nos. 60–1, 60–2.

In addition, Plaintiff has reiterated in the TAC its complaints against Defendant IBM Credit, LLC ("IBM Credit"): Plaintiff has clarified that its purpose in so doing, despite this Court's dismissal of those claims with prejudice, is to preserve these claims for appeal; however, Plaintiff has not asked this Court for reconsideration of its dismissal with prejudice as to

Defendant IBM Credit.[3] Doc. No. 59, p. 14, fn. 2; Doc. Nos. 60 and 61.

## III. JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1332. Venue is proper because the Plaintiff has its principal place of business in Duncansville, Blair County, Pennsylvania.

## IV. STANDARD OF REVIEW

### A. Motions for Reconsideration

■ As summarized by the Third Circuit, "The purpose of a motion for reconsideration is 'to correct manifest errors of law or fact or to present newly discovered evidence.' [*internal citations omitted*]. A proper Rule 59(e) motion therefore must rely on one of three grounds: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error of law or prevent manifest injustice." *Lazaridis v. Wehmer*, 591 F.3d 666, 669 (3d Cir.Del. 2010); *citing Max's Seafood Cafe v. Quinteros*, 176 F.3d 669, 677 (3d Cir.1999); *also citing N. River Ins. Co. v. CIGNA Reinsurance Co.*, 52 F.3d 1194, 1218 (3d Cir.1995); *see also Toy v. Plumbers & Pipefitters Local Union No. 74 Pension Plan*, 317 Fed.Appx. 169 (3d Cir.2009); *citing Harsco Corp. v. Zlotnicki*, 779 F.2d 906, 909 (3d Cir.1985); *also citing Max's Seafood Cafe by Lou–Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir.1999); *see also Piscitelli v. Mirow (In re Nicola)*, 65 Fed.Appx. 759, 764 (3d Cir.2003) (" 'The purpose of a motion for reconsideration is

Statute of Limitations defense argued by Defendants.

**2.** We do not comment on whether the TAC is adequate in this regard, as that issue will be covered in a future order addressing Defendant IBM's Motion to Dismiss the Third Amended Complaint (Doc. No. 62).

**3.** We make no comment as to whether or not Plaintiff has successfully preserved its case for appeal as to IBM Credit, as this issue is not before this Court. Rather, reconsideration of the dismissal of claims against Defendant InfoPrint is the issue at hand.

to correct manifest errors of law or fact or to present newly discovered evidence.' "); *quoting Harsco v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985). *See also Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir. 1985) ("The purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence. [*internal citations omitted*]. Where evidence is not newly discovered, a party may not submit that evidence in support of a motion for reconsideration."); *citing DeLong Corp. v. Raymond International Inc.,* 622 F.2d 1135, 1139–40 (3d Cir.1980).

Further, "[a] court may not grant a Motion for Reconsideration when the motion simply restyles or rehashes issues previously presented. [*internal citations omitted*]. A motion for reconsideration 'addresses only factual and legal matters that the Court may have overlooked.... It is improper on a motion for reconsideration to ask the Court to rethink what [it] had already thought through rightly or wrongly.' [*internal citations omitted].* Because federal courts have a strong interest in the finality of judgments, motions for reconsideration should be granted sparingly." *Karn v. Ben Avon Borough,* 2011 WL 2600671, *1, 2011 U.S. Dist. LEXIS 70832, *2–3 (W.D.Pa.2011). *citing Pahler v. City of Wilkes–Barre,* 207 F.Supp.2d 341, 355 (M.D.Pa.2001); *also citing Glendon Energy Co. v. Borough of Glendon,* 836 F.Supp. 1109, 1122 (E.D.Pa. 1993).

## V. DISCUSSION

As noted above, Plaintiff argues that its claims against Defendant InfoPrint should be reinstated, as new evidence has come to light that Defendant InfoPrint knew that the printers could not be "fixed" or corrected so that they would perform to specifications, yet kept asserting to Plaintiff that the issues could and would be fixed. Doc. Nos. 60 and 61. In addition, Plaintiff further asserts that Defendant InfoPrint attempted to convince Plaintiff to purchase more of the same type of printers and sign up for additional maintenance contracts with InfoPrint, despite the fact that Defendant InfoPrint knew that these additional machines would also be unable to function in the manner that Plaintiff required, and knew that it (Defendant InfoPrint) would be unable to "fix" them. Doc. Nos. 60, 61.

Plaintiff argues that it "promptly filed suit on December 17, 2008. This is nearly a year before the date that the statute of limitations would have expired when measured from the date [that] ... Defendants admitted to North American ... that the Printers were defective." Doc. 68 at 13. (Plaintiff asserts that this date is August 29, 2007, *see supra* ).

Plaintiff argues that a newly-produced internal email communications between Defendants IBM and InfoPrint's executives, the contents of which seem to indicate that IBM and/or InfoPrint knew at the time of the email communications, in early October, 2007, that the printers might not be fixable, qualifies as "new facts" which support Plaintiff's Motion for Reconsideration. Doc. 68 at 14. However, this argument does not justify reconsideration of the claims against Defendant InfoPrint—the emails are dated October 2 through October 10, 2007; there is no indication on the record that Defendant InfoPrint knew the printers were unfixable, but fraudulently hid this fact, at an earlier point in time. Plaintiff asserts that Defendant InfoPrint informed Plaintiff that it believed the printers could not be fixed on August 29, 2007. Doc. No. 68 at 12. Therefore, this "new evidence" indicating that Defendant InfoPrint may have known of the printers' defects and may have been fraudulently concealing these defects as early as October 10, 2007, does not change the case against Defendant InfoPrint. We

refer the litigants back to this Court's ruling of January 13, 2011, wherein we explained the reasons that the claims against Defendant InfoPrint must fail: in short, Defendant InfoPrint had a service contract with Plaintiff. Defendant Info-Print did not supply the printers, and owed no duty as to the underlying quality of the printers, but rather contracted only to service those printers, which Plaintiff had purchased from Defendant IBM. If it is true that Defendant InfoPrint attempted to persuade Plaintiff to buy additional printers after it had concluded that the printers were fundamentally defective, for the purpose of putting itself in a position to offer service contracts for those printers, this is certainly dishonest. However, Plaintiff acknowledges that it did not purchase more printers, and also acknowledges that Defendant InfoPrint informed Plaintiff that the printers were defective on August 29, 2007. Doc. 68. Indeed, it seems, based on Plaintiff's recitation of facts, that Defendant InfoPrint advised Plaintiff of its conclusion that the printers were not fit to run MICR technology on August 29, 2007, immediately following the conclusion of a year of unsuccessful attempts by InfoPrint's employees, from July or August 2006 to August 2007, to "fix" the printers. Doc. No. 68 at 7–8. In other words, Defendant InfoPrint's conclusion on August 29, 2007 appears to have followed a year-long attempt to fix the printers, and also appears to have been based on the failure of that attempt. Plaintiff has not provided any indication that Defendant InfoPrint knew that the printers were defective at an earlier date and thus was somehow committing fraud by remaining silent while making a show of attempting to fix them, when it knew they were unfixable. In addition, even if Plaintiff were to demonstrate that Defendant InfoPrint knew that the printers were defective prior to August 29, 2007, this would be immaterial to the complaint against InfoPrint: even if Plaintiff's arguments regarding a tolling of the statute of limitations are accepted, the problem remains that Plaintiff has no claim against Defendant InfoPrint because Plaintiff had a contract with Defendant InfoPrint to provide service for the printers only, not to provide the printers themselves—that contract was with Defendant IBM, and Info-Print was not a party to that contract. For more detail on this analysis, see this Court's Order of January 13, 2011.

Further, Plaintiff's vague contentions that Defendant InfoPrint tried to persuade Plaintiff to purchase more printers so that Defendant InfoPrint could provide service under additional contracts for those additional printers are immaterial: Plaintiff has stated that it did not purchase additional printers, therefore even if Defendant InfoPrint did encourage this, there was no damage as a result of this encouragement,

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Reconsideration (Doc. 60) is **DENIED.** An appropriate order follows.

### *ORDER*

**AND NOW,** this 21st day of July, 2011, this matter coming before the Court on Plaintiff's Motion for Reconsideration and Extension of Pre-trial deadlines (Doc. 60), **IT IS HEREBY ORDERED** that the Defendant's Motion for Reconsideration of this Court's dismissal of its claim against former Defendant InfoPrint is **DENIED,** for the reasons stated in the foregoing memorandum.